JOLINE et al. v. METROPOLITAN SECURITIES CO.

(Circuit Court, S. D. New York.    September 22, 1908.)

1. PLEDGES—PLEDGE DISTINGUISHED FROM SALE.
   A street railway company leased all of its lines and property for a long term. The lease provided, among other things, that on an agreement that extensions or additions to the property were required the lessee should furnish the money therefor, for which the lessor should issue its approved securities. A contract was subsequently made between them by which the lessee agreed to furnish $8,000,000 in cash to make certain extensions and pay certain indebtedness of the lessor, which on its part agreed to issue its improvement notes for the amount to defendant, a trust company. On the same date a contract was made between the lessee and defendant, by which defendant agreed "as and when required on reasonable notice, and in any event before January 1, 1909," to furnish to the lessee such sums as might be required by it to carry out its contract with the lessor, whose notes defendant received. All of such companies were intimately related; the officers and directors being largely the same, and defendant being the owner of all of the stock of the lessee. *Held* that, construing the lease and the several contracts together, the last contract constituted a purchase by defendant of the notes of the lessor, and not a receipt of the same as collateral to an indebtedness of the lessee, and that receivers appointed for the lessee were entitled to recover from defendant the unpaid portion of the purchase money.

2. CONTRACTS—RIGHT OF ACTION—DEMAND OF PERFORMANCE.
   After demand of part of the amount by the receivers and an absolute refusal by defendant to pay, no further demand beyond the bringing of suit was necessary to fix the liability of defendant.

3. SAME—CONSTRUCTION—WORDS OF DESCRIPTION.
   The provision of the contract that defendant should furnish to the lessee such sums as might be required by it to carry out its contract with the lessor, a copy of which contract was attached, were words of description and not of condition, and so far as defendant was concerned it had nothing to do with the purpose to which the money due from it was applied.

Masten & Nichols (Joseph H. Choate, Arthur H. Masten, and Joseph D. Beatty, of counsel), for plaintiffs.

Cravath, Henderson & De Gersdorff (Paul D. Cravath and Joseph P. Cotton, Jr., of counsel), for defendant.

WARD, Circuit Judge.    This is an action at law, tried before me without a jury, arising out of the following transactions:

February 14, 1902, the New York City Railway Company (then called the "Interurban Street Railway Company") leased the properties of the Metropolitan Street Railway Company for 999 years, agreeing: (1) To maintain and operate the properties; (2) to pay all taxes and assessments against the properties or against the lessor or its franchises or business; (3) to pay all rents under leases of subsidiary properties to the lessor and all lessor's fixed charges; (4) to pay 7 per cent. per annum on the lessor's capital stock, $52,000,000, and such additional capital as should be thereafter issued with the consent of the lessee; (12 and 16) to furnish to the lessor in exchange for certain securities the sum of $23,000,000 for the purpose of paying its floating indebtedness and providing for certain contemplated expenditures; (15) after

the $23,000,000 has been exhausted, money for expenditures chargeable to capital account, that is, not properly chargeable to current maintenance and operation, to be provided by the lessee, the lessor issuing its securities therefor to the lessee. If the parties cannot agree that the expenditures proposed by the lessee are advisable and chargeable to capital account, and upon the nature and amount of securities to be issued by the lessor to provide for them, these questions to be determined by arbitration.

February 14, 1902, the Metropolitan Securities Company (hereinafter called the "Securities Company") subscribed for $12,500,000 of the New York City Railway Company's (hereinafter called the "City Company") stock at par and for $15,000,000 par of its debentures at a price to make the aggregate amount due $23,000,000, agreeing to pay the same in such installments as should be necessary to enable the City Company to pay $23,000,000 to the Metropolitan Street Railway Company (hereinafter called the "Metropolitan Company") as required by the lease.

May 22, 1907, the Metropolitan Company, lessor, and the City Company, lessee, at meetings of their boards settled their accounts as of May 1st as follows: The lessor admits that the lessee has paid $23,000,000 to it, and the lessee admits that it has received the securities from the lessor, as required by the lease. The lessor admits owing $2,574,487 (afterwards corrected to $2,834,484.31) to the lessee for construction, for which the latter is entitled to the lessor's securities. The lessor's indebtedness, including the foregoing item, amounts to $4,125,262 (with the above correction $4,385,258.51), and the estimate for contemplated construction to January 1, 1909, amounts to $4,000,000 more, to meet which it is proposed that the lessor shall issue its improvement notes to the amount of $8,000,000 secured by certain named collateral. It will be noticed that the notes were to be issued to raise money to pay, among other things, this specific indebtedness of $2,834,484.31.

The Metropolitan Company, lessor, and the City Company, lessee, thereupon entered into the following contract, called throughout the trial "Schedule A":

"Agreement made this twenty-second day of May, 1907, between the Metropolitan Street Railway Company, party of the first part (hereinafter called the 'Metropolitan Company'), and the New York City Railway Company, party of the second part (hereinafter called the 'City Company'):

"Whereas, the parties entered into a certain agreement of lease, dated the 14th day of February, 1902, under which the Metropolitan Company leased to the City Company for the term of nine hundred and ninety-nine years all its lines of street surface railroad owned and leased on certain terms therein more particularly stated, in which it was provided that the City Company should furnish the Metropolitan Company the sum of $23,000,000 for the purposes therein named, and further provided that if, after the expenditure of such part of said sum of $23,000,000 so to be paid as should be available for additional equipment, improvements, and extensions of the Metropolitan Company, it should be deemed expedient by the City Company to extend the lines of railroad demised by said lease or the lines of railroad of any subsidiary company (as therein defined), or to construct any branches of any such lines, or to provide any additional and increased equipment for, or to make any change in motive power upon, or any radical change of construction, location, or character of, any such lines, then such expenditures should be pro-

vided for by the issue of securities of the Metropolitan Company in accordance with said agreement of lease; and whereas, the $23,000,000 so to be paid under said lease has been paid by the City Company to the Metropolitan Company, and no part thereof is available for additional equipment, improvements, and extensions, and certain other advances have been made and are to be made to or for the Metropolitan Company, for which and to provide for certain other indebtedness the Metropolitan Company is likewise obligated to issue its securities under the terms of the lease above described; and whereas, the Metropolitan Company and the City Company also entered into agreements dated February 14, 1902, and March 20, 1902, providing further terms for the payment of said sum of $23,000,000 payable under said lease, and all the conditions of said agreements have been fully carried out and the accounts between the two companies have been stated and approved:

"Now, therefore, in consideration of the premises and the mutual covenants of the parties, it is agreed: (1) The City Company shall, as and when required, on reasonable notice, and in any event before January 1, 1909, furnish the Metropolitan Company eight million dollars in cash. (2) The Metropolitan Company shall forthwith issue and deliver to the Metropolitan Securities Company or its order its three-year five per cent. improvement notes to the face amount of $8,000,000. Said notes shall mature July 1, 1910, and shall bear interest from July 1, 1907, at the rate of five per cent. per annum, payable semiannually on the first days of January and July in each year (with the option to the holder to declare the principal due on default in any payment of interest), and shall be payable to the Mercantile Trust Company, or bearer, as the City Company may require. For the security of said notes the Metropolitan Company assigns, transfers, and sets over to the Securities Company all claims, notes, and accounts of every kind, nature, and description which the Metropolitan Company now has and in the future may have against any of its subsidiary companies. The Metropolitan Company shall, on the reasonable demand of said Securities Company and the City Company, obtain obligations in such form as may be mutually agreed upon representing such claims, notes, and accounts, and deliver the same to the Securities Company or its nominees as additional security for said improvement notes issued in accordance with this agreement, and the Metropolitan Company shall, from time to time, for its said improvement notes, at the request of the City Company, substitute 'collateral improvement notes' of the same terms and amounts and secured by such collateral. Subsidiary companies under the terms of this agreement shall be construed to mean such companies as are leased to or operated by any of the parties hereto, or of which the majority of the capital stock is owned or held at the date of this agreement by the parties hereto or said Securities Company. (3) Said Securities Company shall have the right to pledge and hypothecate said improvement notes of the Metropolitan Company, accompanied by all the collateral therefor delivered hereunder, and to allow the pledge and hypothecation of the same for obligations of the Interborough-Metropolitan Company issued for the purpose of raising moneys to be advanced to said Securities Company, such pledge and hypothecation to be in such amounts and on such terms as the Interborough-Metropolitan Company in its discretion may see fit."

On the same day the City Company, lessee, entered into the following contract with the Securities Company, called throughout the trial "Schedule B":

"Agreement made this 22d day of May, 1907, between the New York City Railway Company, party of the first part (hereinafter called the 'City Company'), and the Metropolitan Securities Company, party of the second part (hereinafter called the 'Securities Company'):

"The parties hereto entered into a certain agreement, dated February 14, 1902, providing for the furnishing of certain sums by the Securities Company to the City Company, and the issue therefor by the City Company to its stock and its ten-year debentures therein described. The accounts between the parties thereunder have been stated and approved, and the Securities Company has fulfilled all its obligations for subscription of stock of the City

Company thereunder, and is the holder of certain of ten-year debentures of the City Company issued thereunder, and is obligated thereunder to subscribe and pay for additional ten-year debentures. The City Company has entered into an agreement of even date with the Metropolitan Street Railway Company (a copy of which is hereto attached), under which the Metropolitan Street Railway Company has, at the request of the City Company, delivered, or is about to deliver, to the Securities Company, its three-year five per cent. improvement notes to the face amount of $8,000,000, as in said agreement described:

"Now, therefore, in consideration of the premises and the mutual covenants of the parties hereto, it is agreed: (1) Said agreement of February 14, 1902. and all obligations hereunder are canceled with the consent of both parties, and all ten-year debentures of the City Company received under said agreement and now held by the Securities Company shall be forthwith redeemed by the City Company at the same rates as the same were delivered under said agreement. (2) The Securities Company shall, as and when required, on reasonable notice, and in any event before January 1, 1909, furnish to the City Company such sums as may be required by it to carry out the attached agreement by it with the Metropolitan Street Railway Company, and will also advance to it such other sums as may be required by the City Company before January 1, 1909, against the issue of demand notes of the City Company therefor of the same face amount as such advances, payable to the Securities Company, or its order, or its nominees, as it may require, and bearing interest at the rate of six per cent. per annum. (3) The City Company agrees to assign, transfer, and deliver, and hereby assigns, transfers, and delivers, to the Securities Company all the shares of stock and securities set out in Schedule A hereto attached at the values therein stated; payment to be made forthwith by the canceling of obligations of the City Company held by the Securities Company to the same aggregate face amount as to the aggregate of such values set out in Schedule A. (4) The amount of interest on the improvement notes of the Metropolitan Company issued and delivered to the Securities Company shall be adjusted on each half-yearly interest day on the basis of such amounts as may from time to time have been advanced hereunder to the City Company for the fulfillment of its obligations to the Metropolitan Company under the annexed agreement between said companies."

On the same day the Securities Company entered into a contract with the Interborough-Metropolitan Company (hereinafter called the "Inter-Met Company"), whereby the latter agreed to advance $15,000,000 to the former against its 6 per cent. demand notes secured by the Metropolitan Company's improvement notes and certain other securities. On the next day the Inter-Met Company entered into an agreement with the Mercantile Trust Company, as trustee, whereby the latter agreed to certify the former's three-year collateral trust notes to the amount of $15,000,000 against securities, including, among others, improvement notes of the Metropolitan Company, deposited with it. June 4, 1907, the Metropolitan Company approved a scheme of contemplated construction submitted by the general manager of the City Company, estimated at $4,000,000.

These companies, except the Mercantile Trust Company, were all closely related to each other and interested in the same general operation. The Inter-Met Company owned 96 per cent. of the stock of the Securities Company, and the Securities Company owned the entire capital stock of the City Company. Copies of the contracts of May 22d between the Metropolitan Company and the City Company (Schedule A) and between the City Company and the Securities Company (Schedule B) were annexed to the originals of each, respectively, and to the contract between the Securities Company and the Inter-Met

Company. The same person was president of the Metropolitan Company and of the City Company. Each company had a board of nine members, and four persons were directors on both boards, and all the directors of the Securities Company were directors of one or both of the other companies. The effect of the documents executed on May 22, 1907, was to settle accounts between the Metropolitan Company and the City Company and between the City Company and the Securities Company, and to provide funds to pay for the indebtedness of the Metropolitan Company, described as accrued and to accrue, to an amount exceeding $8,000,000.

September 24, 1907, the plaintiffs were appointed by this court receivers of the City Company, and on October 1st receivers of the Metropolitan Company. October 11, 1907, the plaintiffs, as receivers of the City Company, called upon the defendant for $1,245,754.33 under its contract (Schedule B), to which the defendant answered October 18th that it was advised by counsel that, the Metropolitan Company and City Company having become insolvent, it was under no obligation to make further advances to the City Company or its receivers. March 7, 1908, this suit was brought to recover $4,964,000, the whole balance of $8,000,000 unpaid by the defendant.

The kernel of the controversy is the construction of article 2 of the agreement of May 22, 1907 (Schedule B), between the City Company and the Securities Company. The plaintiffs contend that it shows a purchase by the Securities Company of the Metropolitan Company's notes, and a promise to pay over to the City Company, on reasonable notice, before January 1, 1909, the sum of $8,000,000, and, only $3,036,000 having been so paid over, they bring this suit to recover the balance. The defendant, on the other hand, insists that it shows an agreement of the Securities Company to lend the City Company up to $8,000,000, the Metropolitan Company's notes being collateral to the obligation of the City Company, either expressed or to be implied, to repay, and therefore it makes a claim against the City Company for the amount actually advanced, $3,036,000 and interest, for which it holds the Metropolitan Company's notes as collateral, with no obligation to make further advances because of the insolvency of the Metropolitan Company and the City Company.

Neither construction is free from difficulty. If the transaction was a sale of the Metropolitan Company's notes to the Securities Company, there was no necessity for article 3 in the contract between the Metropolitan Company and the City Company (Schedule A), authorizing the Securities Company to hypothecate the notes with the accompanying collateral and to permit the Inter-Met Company to do the same thing. The owner of a note accompanied by collateral has a right to sell or hypothecate it with the collateral, though he cannot hypothecate the collateral separately for any other indebtedness. Whereas, if the notes were held as collateral to the obligation of the City Company to repay, the Securities Company could not pledge them except as accompanying that obligation. Therefore the provision may be either an attempted limitation of the ordinary rights of the Securities Company, if a purchaser of the notes, or a privilege to it, if a lender to

the City Company with the notes as collateral. In the latter case the privilege should have been given by the City Company in its agreement with the Securities Company (Schedule B), and not by the Metropolitan Company, in Schedule A, as it has no contract with the Securities Company. On the other hand, if the notes were delivered as collateral, who was the principal debtor? For the expenditures themselves, evidently, the Metropolitan Company, as between itself and the City Company. That being the case, there is no apparent reason why the latter should assume any personal liability for them, although, being the lessee and operator of the property, it was natural that it should secure and apply the funds to be raised on the credit of the lessor. Article 2 of Schedule B calls for no promise to repay the $8,000,000 from the City Company, although it expressly provides that advances other than the $8,000,000 are to be made against the City Company's demand notes. In the very next of this series of contracts, viz., that between the Securities Company and the Inter-Met Company, made on the same day, the Inter-Met Company agrees to advance against the Securities Company's demand notes; and, although over $3,000,000 was paid by the Securities Company to the City Company, no note or acknowledgment was asked from or given by the City Company.

I think these contracts were intended to effectuate the provision of article 15 of the lease that the lessor would deliver its securities, in a form and amount to be agreed upon or determined by arbitration, to the lessee, to enable it to raise money for expenditures chargeable to capital account. The Metropolitan Company had under article 15 the right to issue its securities with the consent of the City Company for so much of the indebtedness as the City Company was not liable for. The unnecessary provision of article 3 of Schedule B as to hypothecation is not sufficient, merely because more consistent with a loan, to overcome the otherwise plain intent of the parties. I therefore find that this was a sale by the City Company of the Metropolitan Company's notes to the Securities Company, and not an agreement by the Securities Company to lend money to the City Company with the notes as collateral. Insolvency of the Metropolitan Company and the City Company, each of which has performed its contract obligations, would be no defense to the defendant for nonperformance of its obligation to pay for what it had received.

I will now briefly mention some other considerations discussed by counsel, to show that they have not been overlooked.

The journal entries in the books of each company are a bookkeeper's form of expressing what took place, and I think can be read consistently with the theory of either party.

The conduct of the defendant in filing claims against the companies seems to me consistent with its theory. November 29, 1907, it filed its claim against the City Company for $3,036,000, the amount actually paid out, and this must have been on the theory that it was lending to the City Company. February 1, 1908, it filed its claim for the whole $8,000,000 of improvement notes against the Metropolitan Company. This was exactly what a holder (which, however, the de-

fendant was not) of the notes as collateral should have done. No one could tell, in the condition of the Metropolitan Company, whether the notes would produce $3,036,000, and, if they did produce more, the surplus would go to the Metropolitan Company. May 23d it modified its notice of February 1st by limiting its claim to the amount actually advanced.

The provision of article 4 of Schedule B seems to me consistent with a sale by the City Company of the notes to the Securities Company, because it is liable under article 3 of the lease to pay the interest on the notes as a fixed charge.

I do not think that the exception pointed out in Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, to the doctrine of Hochster v. De la Tour, 2 El. & Bl. 678, viz., that it does not apply to contracts for payment of money merely, has any application to the contract (Schedule B) because it was not a promise to pay upon a fixed future date, but upon reasonable notice before January 1, 1909, and reasonable notice was given by the plaintiffs October 1, 1907, for $1,-245,754.33, and after the defendant's absolute refusal to pay reasonable notice was given for the whole balance by the institution of this action March 8, 1908.

The defendant further insists that under any circumstances it is not bound either to loan or to pay a definite sum, but only such moneys as may be required by the City Company to fulfill its contract with the Metropolitan Company; i. e., construction expenditures incurred after May 22, 1907, subsequently formulated in the report of the general manager of the City Company to the board of the Metropolitan Company and adopted by resolution June 4, 1907—the amount of money so required not to be more than $5,165,516.79, the balance after deducting from $8,000,000 the $2,834,483.21. It is said that the plaintiffs, not having shown any such expenditures in excess of $3,036,-000, the sum already paid, are entitled to recover nothing. No doubt, as between the Metropolitan Company and the City Company, the latter had to furnish after May 22d only $5,165,516.79, because it had already furnished $2,834,483.21; but it was the expressed intention of both the Metropolitan Company and the City Company that the latter should be reimbursed out of the Metropolitan Company's $8,-000,000 improvement notes delivered to the Securities Company, and that was the requirement of the lease. I think the Securities Company has no standing to say the contrary, or to offset the City Company's payment before May 22, 1907, against its promise to pay the City Company $8,000,000 on demand.

The language relied upon, viz., that the Securities Company shall "furnish to the City Company such sum as may be required by it to carry out the attached agreement by it with the Metropolitan Street Railway Company," are words of description, and not of condition. It is another way of saying that the Securities Company is to pay $8,000,000, and has nothing to do with the application of the money. The City Company and the Metropolitan Company might alter as they chose the nature of the expenditures. It can hardly be supposed that in this large operation they intended to submit the character of the improvements to be made to the Securities Company. Whatever the

Metropolitan Company agreed upon as a capital charge was to be a capital charge. The parties could change and rechange the character of the expenditures as much and as often as they pleased without in any way affecting the liability of the Securities Company. When the plaintiffs became receivers of both properties, they took the places of the lessor and lessee, which had fully executed the obligations under the contracts of May 22, 1907. Being disinterested officers of the court, they can, under the direction of the court, call as receivers of the City Company upon the defendant for the payment of the money and apply it in accordance with the lease to such expenditures upon the property of the Metropolitan Company as they find are necessary and chargeable to capital account as distinguished from maintenance and operation. I find that they have done so with reasonable notice to the defendant.

Finally, the defendant contends that under the contract, even construed as an absolute promise to pay, it is entitled to a credit of $503,-833.33. Part of the indebtedness of the Metropolitan Company intended to be covered by the proceeds of its $8,000,000 of notes consisted of an indebtedness due by it to the Central Crosstown Railroad Company. This indebtedness the defendant, without consulting the plaintiffs, as receivers of the City Company, voluntarily paid directly to the Metropolitan Company, as far as I can make out from the somewhat contradictory documents and testimony, under the following circumstances:

The Metropolitan Company had in the Morton Trust Company a special account, called "The Metropolitan Street Railway Company, Central Crosstown Railroad Company Special Construction Fund," being $814,931.12, proceeds of sale of the Central Crosstown Railroad Company's securities. This fund the Metropolitan Company held under article 12 of the lease of the Central Crosstown Railroad Company's property, dated February 12, 1904—

"to be applied to the payment of the construction debts and unfunded liabilities of the lessor as of the date when this lease goes into effect, and to defray the expense of acquiring such additional equipment and other property, real or personal, and doing such construction as in the opinion of the lessee shall be necessary or proper in the management and operation of the leased railroads, including the lines of the said Christopher & Tenth Street Railroad Company leased to the lessor hereunder as hereinabove set forth."

The Metropolitan Company lent $500,000 out of this fund to the Securities Company and $300,000 to the City Company. The Securities Company repaid the loan to the Metropolitan Company, and the Metropolitan Company kept the amount as borrowed by itself. Mr. Moorehead, the secretary and treasurer of the Metropolitan Company, says that he received a check from the Securities Company for $800,-000, dated September 25, 1907, which was deposited in the Metropolitan Company's general account in the Morton Trust Company, and that on the same day he delivered the check of the Metropolitan Company for $814,931.32 to August Belmont & Co., to be held as a special deposit to the credit of the Central Crosstown Railroad Company.

No doubt this was what was done, though the day on which it was done is by no means clear. The letter of the Securities Company, in-

closing the check to the Metropolitan Company to be deposited in the special construction fund of the Central Crosstown railroad Company, is dated October 1st while the letter of the Metropolitan Company to August Belmont & Co., inclosing check for $814,931.32, is dated September 24, 1907. I am compelled to infer that the payment, whenever made, was made to protect the Metropolitan Company in respect to this use of the Crosstown Company's construction fund, and that it was intentionally made, without consulting the receivers of the City Company, so as to insure payment to this special account out of the funds due from the Securities Company. I do not think that the Securities Company is entitled to any credit for this payment under the contract of May 22d, against the plaintiffs' objection.

The defendant's motion to dismiss the complaint on the merits is denied, and judgment may be entered for the plaintiffs in the sum of $4,964,000, with interest at 6 per cent. per annum on $1,245,754.33 thereof from October 18, 1907, and on $3,718,245.67 from March 8, 1908.