## AMERICAN BRAKE SHOE & FOUNDRY CO. v. NEW YORK RYS. CO.

(District Court, S. D. New York. November 21, 1921.)

1. **Mortgages** ⊗⟼126—**Lien of mortgage containing general language held not limited to property specifically described.**

The lien of a mortgage containing general descriptive language *held* not limited to property specifically described, as stated "without prejudice to the generality of the language hereinbefore or hereinafter contained."

---

⊗⟼For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Mortgages ⊚⇒131—Clause excepting property from mortgage construed.**

A clause in a mortgage excepting therefrom "cash, or any claims to cash, or the proceeds of assets when reduced to cash," in the hands of the court or its receivers, *held* one of identification, and not of time limitation, and such property, on coming into possession of the mortgagor, *held* not subject to the after-acquired property provision of the mortgage.

**3. Street railroads ⊚⇒54—Clause excepting property from mortgage construed.**

In a first mortgage executed by a reorganized street railroad company, formed by a reorganization committee which purchased the property at foreclosure sale, a clause exempting from the mortgage choses in action owned by the company at its date *held* to apply to rights acquired through the committee, as representing bondholders and other creditors joining in the reorganization, in the purchase money fund or other assets of the old company, under the plan of reorganization.

**4. Street railroads ⊚⇒54—Bonds held not to pass under mortgage.**

Under a provision of a street railway mortgage that, if the company should acquire certain bonds of other companies, on their deposit with the trustee with a resolution so requesting the trustee should authenticate and deliver to the company bonds under the mortgage to the same amount such bonds of the other companies purchased by the company, but not delivered to the trustee, and for which no mortgage bonds were issued, *held* not to come under the mortgage.

**5. Street railroads ⊚⇒54—"Cash" not covered by mortgage held to include bonds purchased with, and reconvertible into, cash.**

"Cash" of a street railway company not covered by a mortgage *held* to include, not only money in the treasury or on deposit in banks, but also certain bonds purchased for deposit, in lieu of cash, with state and city departments, and which were reconvertible into cash at any time.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Cash.]

**6. Street railroads ⊚⇒54—After-acquired property clause of mortgage held to cover materials and supplies for current use.**

The after-acquired property clause of a street railway mortgage *held* to cover materials and supplies in reasonable quantity kept on hand for current use in operation or for repairs and replacements.

**7. Corporations ⊚⇒473—Bonds held not extinguished by purchase by issuing corporation.**

A purchase by a corporation of its own bonds with cash in its treasury *held* not to extinguish the same where it was the manifest intention that they should be kept alive.

In Equity. Suit by the American Brake Shoe & Foundry Company against the New York Railways Company. On determination of certain questions of lien and amount of mortgage debt.

For brevity and convenience, the Guaranty Trust Company of New York will be referred to as Guaranty Company; New York Railways Company as Railways Company; Farmers' Loan & Trust Company as Farmers' Company; first real estate and refunding mortgage as the first mortgage, and the mortgage of which Farmers' Company is trustee as the adjustment mortgage.

Stetson, Jennings & Russell, of New York City (William C. Cannon, Edwin S. S. Sunderland, and Harrison M. Robertson, all of New York City, of counsel), for plaintiff.

James L. Quackenbush, of New York City (J. Tufton Mason, of New York City, of counsel), for defendant Rys. Co.

Geller, Rolston & Blanc, of New York City (Edward H. Blanc, of New York City, of counsel), for adjustment mortgagee.

Samuel Seabury, John V. Bouvier, Jr., Charles Steckler, and Robert H. Ernest, all of New York City (Samuel Seabury, of New York City, of counsel), for tort creditors' committee.

Chadbourne, Hunt & Jaeckel, of New York City (William M. Chadbourne and Cyrus F. Smythe, both of New York City, of counsel), for contract creditors' committee.

Winthrop & Stimson, of New York City (Bronson Winthrop and George Roberts, both of New York City, of counsel), for Receiver Hedges.

MAYER, Circuit Judge. Guaranty Company, as trustee of the first mortgage of Railways Company, is plaintiff in the mortgage foreclosure suit, No. E 16–163.

It asks for a decree which, inter alia, shall determine: (1) The property covered by the lien of the mortgage; and (2) the amount of the obligation secured thereby. Farmers' Company, as trustee under the adjustment mortgage, opposes the granting of any decree at this time. The further progress of the litigation will be later considered; but, whether or not the time has come for a final decree, it is important, from time to time, to dispose of as many controverted questions as possible, and thus to clear up, so far as practicable, the uncertainties as to respective legal rights in a very complicated situation.

1. *The Property Covered by the Lien of the First Mortgage and of the Supplement Thereto.*—The mortgage is elaborately drawn, and, as will appear infra, was part of the machinery by which a reorganization of the old Metropolitan system was effectuated. After the recitals the mortgage grants to the mortgagee:

"All and singular the property described as follows: All and singular the railways, rolling stock, equipment, property, assets, rights, franchises, consents, legislative and municipal grants, leases, leasehold interests and estates, contracts and privileges, choses in action and all other property, real and personal, of every kind, which were sold under the general decree or the refunding decree as aforesaid, and also all other property, real and personal, of every kind owned by the company on the date of the execution hereof or which may be hereafter acquired by it or on its behalf, subject, however, to the exceptions in this indenture hereinafter stated and made.

"The property so described and covered by the lien of this mortgage shall include particularly, without prejudice to the generality of the language hereinbefore or hereinafter contained, the following lots and parcels."

Then, under headings from "Lot 1" to "Lot 12," inclusive, are set forth descriptions of specific railroads, rights, leases, real estate franchises, chattels, stocks, bonds, and buildings. "Lot 13" reads as follows:

"Parcel 1. All and singular the railroads, lands, buildings, structures, fixtures, privileges, franchises, rights of way, trackage rights, contracts, consents, leaseholds, easements, and other rights and interests owned by the Metropolitan Street Railway Company on March 21, 1902; also all and singular the tracks, side tracks or sidings, switches, rails, bridges, fences,

buildings, depots, station houses, power houses, car houses, machine shops, repair shops, and other shops and all other buildings, improvements, erections, and structures, and all dynamos, belting, engines, boilers, regulators, meters, poles, trolleys, conduits, feeders, cables, wires, switchboards, lamps, and machinery for producing, generating, and distributing electricity or power; and also all and singular the rolling stock, equipment, motors, engines, tenders, carriages, cars, trucks, horses, harness, tools, implements, furniture, fixtures, machinery, materials, coal, .wood, oil, fuel and other supplies; and also all maps, drawings, profiles, licenses, records, deeds, contracts, and agreements, patents, and patented inventions and processes owned on March 21, 1902, by Metropolitan Street Railway Company; and also all improvements and additions made on March 21, 1902, or at any time prior to December 29, 1911, upon and to any and all of said railroads or property, real and personal, and any and all equipment therefor and renewals or replacements of the same or of any part thereof or of the appurtenances, and also all and every other railroad which the Metropolitan Street Railway Company acquired subsequent to March 21, 1902, or constructed by means of the proceeds of any of the bonds secured by the refunding mortgage, and all power houses, real estate, equipment, and other property, real or personal, appurtenant thereto; also all property acquired by Metropolitan Street Railway Company subsequent to March 21, 1902, in connection with the premises and property described in the granting clauses of the refunding mortgage, and all renewals and replacements of such property, and all additions, switches, side tracks, betterments, and improvements thereto not subsequently released from the lien of the refunding mortgage, and not hereinbefore described and included."

Under "Miscellaneous," the mortgage provides as follows:

"Also all improvements, additions, or betterments which may hereafter be made or acquired to or for the railroads and other properties now owned or hereafter acquired or constructed by the company.

"Also all and every franchise, right, privilege, consent, and easement of whatsoever kind or nature now owned, possessed, enjoyed, or exercised by the company, or which may hereafter be owned, possessed, enjoyed, exercised, or acquired by it under its certificate of incorporation or by virtue of any act of the Legislature of the state of New York, or of any contract or agreement between it and the authorities vested by law with power to consent to the construction, maintenance, and operation of railroads upon, along, across, and over public streets, avenues, and highways in the state of New York, or in any political subdivision thereof, or by virtue of any agreement or lease between it and any other railroad corporation, or under or by virtue of any authority whatsoever.

"Also all other railroads, railroad routes, extensions, and branches thereof now owned, maintained, or operated, or that may hereafter be owned, maintained, operated, or acquired, by the company, together with all the tracks, rails, special work, conduits, poles, stands, switches, turnouts, turntables, electrical switch material, and other electrical equipment, wires, cables, and feeders, channel rails, fire protection apparatus, conductors, lighting and heating fixtures and tools, engineering equipment and tools, plumbing equipment and tools, transfer tables and elevators, connected with or appurtenant to the said railroads, now owned, constructed, or operated, or that may hereafter be owned, constructed or operated by the said company.

"Also all rolling stock, cars, express cars, engines, boilers, generators, snow ploughs, tools, machinery, motors, power houses, substations, car houses, and railroad equipment and plant now owned or possessed or enjoyed by the company, or which may hereafter be owned, possessed, or enjoyed or acquired by it.

"Also all shares of stock, bonds, notes, and other evidences of indebtedness which may be hereafter acquired by or on behalf of the company, in whole or in part, with bonds or the proceeds of bonds authorized to be issued under article second of this indenture.

"Also all real estate, together with the buildings and improvements thereon, and appurtenances thereto, now owned, possessed, or enjoyed by the company, or which may hereafter be owned, possessed, enjoyed, or acquired by it.

"Also all leasehold interests and trackage and traffic contracts now owned, possessed, or enjoyed by the company, or which may hereafter be owned, possessed, enjoyed, or acquired by it.

"Also all and every right of way, interest, or easement in real estate now owned, possessed, or enjoyed by the company or which may hereafter be owned, possessed, enjoyed, or acquired by it.

"And also all property of every name and nature which, from time to time hereafter, by delivery or by writing of any kind, for the purposes hereof, may be conveyed, mortgaged, pledged, assigned, transferred, or delivered by the company or by any one in behalf of the company with its written consent or approval, to the trustee hereunder as additional security for the bonds issued hereunder; and the trustee shall receive, hold, and apply all such property subject to the trusts of this indenture.

"And also all the rents, issues, profits, tolls, and other income of lines of railway and property, real and personal, privileges, rights, and franchises now or at any time hereafter subject to the lien of this indenture.

"Together with all and singular the tenements, hereditaments, and appurtenances belonging or in any wise appertaining to the said railroads, or to branches and extensions thereof, or to any part thereof, and the reversion and reversions, remainder and remainders, tolls, income, rents, issues, and profits of said railroads, branches, extensions, and appurtenances and also all the estate, right, title, interest, property, possession, claim, and demand whatsoever, as well in law as in equity, of the company in and to the above-described property and every part and parcel thereof, whether now owned or hereafter acquired, and any and all corporate or other rights, privileges, and franchises (including the franchise of being a corporation) which the company now has or which it or its successors hereafter shall acquire, possess, or become entitled to for or appertaining to the ownership, construction, maintenance, use, or operation of the lines of railroad and other property now or at any time hereafter subject to the lien of this indenture; *provided, however, that no part of the foregoing description shall be deemed to include the following excepted property, to wit:  Cash, or any claims to cash, or the proceeds of assets when reduced to cash, in the hands of the court, or the receivers of the Metropolitan Company, or W. W. Ladd, as receiver of the New York City Railway Company, or choses in action and shares of stock and bonds owned by the company at the date hereof not in this indenture elsewhere enumerated or specifically described.* * * * [Italics mine.]

"The mortgaged and pledged property includes the property more particularly described (but without prejudice to the generality of the language in the granting and pledging clauses of this indenture contained) in Schedule A annexed to this indenture, and in Schedule B which has been or will be filed with the trustee and which Schedule A and Schedule B are each hereby made a part hereof by this reference thereto."

Schedule A is a list of tracks in public highways and operated by the Railways Company, with their approximate length.

Schedule B is the list and inventory prepared by W. L. Turner, special master, and filed on May 6, 1910, under the provisions of article V of the decree of foreclosure and sale filed on April 6, 1910, in this court in the cause entitled Guaranty Trust Company of New York, Complainant, v. Metropolitan Street Railway Company and Others, Defendants (Stenographer's Minutes, Oct. 15, 1919, p. 25, Q. 11, Complainant's Exhibit No. 36).

The said decree (S. M. p. 20, Complainant's Exhibit No. 28, p. 29) provided in article V:

"That an inventory shall be prepared by the special master and by him filed with the clerk of this court. * * * This inventory will enumerate the rolling stock of the road in the possession of the receivers, stating the type. * * * This inventory will also state the number and location of the various dynamos, transformers, and converters and the number of horses. The inventory shall include such other articles of personal property in the possession of the receivers as in their opinion are of a value in excess of $100 each, and such additional articles as the special master shall think it wise to include. * * *"

The above extracts have been fully set forth to make clear that the principal controversy as to what was mortgaged revolves around the clause beginning "provided, however," hereinafter for brevity called the "exception clause" or the "exceptions."

[1] It is contended that under Smith v. McCullough, 104 U. S. 25, 26 L. Ed. 637, and Westinghouse v. B. R. T: et al. (C. C. A.) 263 Fed. 532, the lien of the mortgage is confined to the specifically described property and to such future acquired property as is described, in one form or another, under the headings "Lot 13" and "Miscellaneous."

There is nothing to this contention. The language is broad, and the phrase "without prejudice to the generality of the language hereinbefore or hereafter contained" was intended to and does eliminate any construction which as between the parties would narrow the property mortgaged to that specifically mentioned or that which was described in "Lot 13" and "Miscellaneous" as susceptible of future acquisition. See Westinghouse v. B. R. T. et al., 276 Fed. 152, opinion of District Court filed October 6, 1921.

The exception clause divides the property into five classes, as follows:

(1) Cash in the hands of the court or the Metropolitan receivers or Receiver Ladd.

(2) Claims to cash in the same hands.

(3) Proceeds of assets when reduced to cash in the same hands.

(4) Choses in action owned by the company on January 1, 1912, not in the mortgage elsewhere enumerated or specifically described.

(5) Shares of stock and bonds owned by the company on January 1, 1912, not in the mortgage elsewhere enumerated or specifically described.

In respect of (4) and (5) supra it will be noted that the language of the exception clause is definite and deals with property or rights then in existence. As to (4) no chose in action is enumerated nor specifically described in the mortgage, and hence any chose in action owned by the Railways Company on January 1, 1912, is not under the lien of the mortgage. If, therefore, at some later date a chose in action owned by Railways Company on January 1, 1912, ripened into property, whether money or securities or any other kind of property, that chose in action or the property which it produced is not subject to the lien of this mortgage, and the after-acquired property clauses cannot reach it.

So also under (5) any shares of stock or bonds owned by the Railways Company on January 1, 1912, not enumerated nor specifically described in the mortgage are not affected by the after-acquired property clauses.

[2] It is contended by the Guaranty Company that (1), (2), and (3) were excepted only so long as they were in the hands of the court, the Metropolitan receivers, and the New York City Railway Company receiver, but that when later they came into the possession of the Railway Company they were after-acquired property which came under the lien of the mortgage. If any such intention existed, the language fails to show it. Such an intention could have been readily expressed by some appropriate clause, for instance, "but if any of such cash, property, or proceeds after they shall have left the hands or shall no longer be under the control or in the possession of the court and the receivers shall come into the possession of the Railway Company, it shall be subject to and comprehended within the" after-acquired property clause.

It is clear that the exception clause was one of identification and not of time limitation. A significant provision, not much discussed by counsel, but very important, is that at the end of article third, section 2, as follows:

"The company also covenants that any and all cash or other proceeds which may at any time come into its possession and which shall constitute or be the proceeds of 'the cash, or any claims for cash, or the proceeds of assets when reduced to cash, in the hands of the court, or the receivers of the Metropolitan Company, or W. W. Ladd, as receiver of the New York City Railway Company,' in this indenture hereinbefore referred to, shall and will from time to time be applied solely as directed and approved by a resolution of its board of directors passed by the affirmative votes of at least three-fourths in number of the members thereof, but only for one or more of the following purposes, to wit: (a) So much thereof as in such resolution may be specified to be necessary for that purpose shall be set apart and solely used as a portion of the cash working capital of the company: and (b) so much thereof as shall be specified in such resolution may be applied to the purchase, acquisition, discharge, or payment of (1) any claims, demands, liens, or charges mentioned in the general decree or in the refunding decree, or in respect of which the court has reserved power or jurisdiction to require payment to be made out of said funds, or by the purchasers or their assigns, or (2) any other claims against the said funds or assets; and (c) so much thereof as shall be specified in such resolution may be applied to and expended for lawful corporate purposes of the company; and (d) so much thereof as may be specified in such resolution may be used and expended for one or more of the purposes mentioned in subsections (1) and (2) of section 5 of article second of this indenture, for which bonds hereby secured are authorized to be authenticated and delivered under the provisions of section 5 and subject to the limitations and restrictions therein set forth. Any and all additional property or shares of stock, bonds or other securities acquired by means of any of said cash or other proceeds, pursuant to the provisions of the aforesaid paragraph (d), shall become and be a part of the mortgaged and pledged property."

If the (1), (2), and (3) of the exception clause would automatically go under the after-acquired clause, why these elaborate provisions in respect thereof?

The provision as to a three-fourths vote of the board of directors was in accordance with the reorganization plan infra. The plan provided, inter alia:

"The holders of adjustment mortgage bonds shall have power, by a vote of a majority in amount thereof present or represented at meetings of the new company or its stockholders held for that purpose, to elect one less than a majority of the members of board of directors of the new company until full interest at the rate of 5 per cent. per annum shall have been paid to the holders

thereof annually for three successive years, and again thereafter for and during a like period whenever a failure to pay such annual interest shall occur. During the period that the aforesaid voting power is operative the holders of said bonds shall also have full power in respect of all other questions upon which stockholders may be entitled to vote. * * *

"The mortgage securing said bonds shall provide for such other protection and for such method or methods of determining net income as the committee shall fix."

The board of directors was thus composed of persons representing the stock and the adjustment mortgage. Neither group controlled three-fourths of the board of directors. The theory of the requirement of a three-fourths vote was that each group could check the other, if it so determined.

If, to illustrate, additional property were to go under the mortgage, such property would, of course, "feed" the mortgage and might so do at the expense of the rights of stockholders.

Hence before any of the excepted property comprised under the headings of (1), (2), and (3) could be used for the purposes set forth in (d) of section 2 of article third, supra, an affirmative act of the board of directors would be necessary—i. e., a resolution "passed by the affirmative votes of at least three-fourths in number of the members thereof."

Under article second referred to in (d), supra, the authentication and delivery of bonds were authorized for various purposes; and thus under section 5 of that article it was provided that bonds might be authenticated and delivered for certain named purposes. It is to these to which (d), supra, refers when it mentions subsections (1) and (2) of section 5 of article second. These provisions read as follows:

"Section 5. From time to time the company, in addition to the bonds in sections 2, 3, and 4 of this article second authorized to be issued, may sign and seal and deliver to the trustee bonds hereby secured, and the trustee shall authenticate and deliver the same to the company or upon its order, signed by its president or one of its vice presidents, but only for some one or more of the following purposes and under and subject to the following conditions and restrictions, namely:

"(1) To pay, or to provide funds to reimburse the company for, sums expended by it after the date of this indenture for the acquisition of additional property (to be subjected to the lien of this indenture as hereinafter provided) and for the construction, completion, extension, and improvement of the facilities and properties of the company; and

"(2) To pay, or to provide funds to reimburse the company for, sums expended by it after the date of this indenture for the acquisition and pledge hereunder of shares of stock, bonds, and other obligations of other street railroad corporations in the city of New York or adjacent territory or of shares of stock of corporations owning or operating a railroad in said city or adjacent territory over and upon one or more bridges across East River or North River and the approaches thereto, or owning street railroad terminals, all the securities of which shall be held by the company and by other street railroad or passenger transportation companies or by holding companies organized for the purpose of holding stock in street railroad or passenger transportation companies in said city or adjacent territory, provided that in the case of any such street railroad corporation at least a majority in amount of the capital stock thereof shall be owned by the company and pledged with the trustee hereunder, or, in case of the acquisition of shares of stock in any such street railroad corporation, that, by and in consequence of such acquisition, the company will own, and there will be simultaneously pledged with the trustee

hereunder, at least a majority of the capital stock of such other street railroad corporation, and provided always that in every case in this subsection (2) provided for such acquisition and the terms thereof shall have been first consented to and approved in writing by the finance committee hereinafter provided for, and provided further and always that at no time shall bonds secured hereby be issued for any of the purposes in this subsection (2) mentioned if thereby the aggregate amount of bonds issued for such purposes and outstanding, including the bonds then requested to be issued for such purposes, shall exceed 25 per cent. of the aggregate face amount of all the bonds hereby secured and then outstanding which shall have been issued as provided in sections 2, 3, and 4 of this article second, including all such bonds issued for the purposes described in the foregoing subsection (1) of this section 5. All stocks, bonds, or other securities so acquired forthwith shall be deposited with the trustee duly indorsed for transfer in blank.  *  *  * "    (Then follow details of procedure.)

From all of the foregoing it is plain that it was clearly intended to leave the property referred to in the exception clause outside of the lien of the mortgage. No matter when the "cash" or "proceeds" came into the hands of the Railways Company, neither such cash nor proceeds nor any property acquired therewith could be subjected to the lien of the mortgage, unless affirmatively so decided in the manner set forth in paragraph (d), supra.

But, in addition to the instrument itself, it is permissible to examine into the surrounding circumstances. Smith v. McCullough, 104 U. S. 25, 26 L. Ed. 637; Westinghouse v. B. R. T. et al. (C. C. A.) 263 Fed. 532; Westinghouse v. B. R. T. et al., 276 Fed. 152, filed October 6, 1921.

There is much antecedent history, but the essentials are herewith stated. It is agreed by counsel that the following is a correct statement of fact:

(1) On January 1, 1912, and on the date of the execution of the first mortgage, there were in the hands of the court or of the receivers of Metropolitan Street Railway Company and New York City Railway Company:

(a) Cash in the hands of the receivers of the Metropolitan Street Railway Company, being income received from the property during the receivership and certain other assets.

(b) Cash in the hands of the court, being the qualifying amount deposited by the joint reorganization committee on the purchase under the Metropolitan foreclosure decree.

(c) The proceeds, consisting of cash, real estate, and securities, of the so-called action at law and suit in equity, brought by the receiver of the New York City Railway Company.

The foregoing items described in (a), (b), and (c) are hereinafter for brevity referred to as the "Ladd fund."

(2) The Metropolitan Street Railway Company (hereinafter called Metropolitan Company) was a consolidation of several companies operating street railways in New York City. It was also the lessee of the property of a number of other companies. By indenture dated February 14, 1902, it let all of its property to New York City Railway Company (hereinafter called the City Company) for a period of 999 years, the rental being the payment of all its charges and a sum equiva-

lent to 7 per cent. per annum upon its capital stock. The Metropolitan Company had two mortgages which are referred to in the first mortgage of the Railways Company as the general mortgage and the refunding mortgage respectively of the Metropolitan Company. The City Company had no mortgages. All of the stock of the City Company was owned by the Metropolitan Securities Company (hereinafter called the Securities Company), the stock of which was in turn owned by the Interborough-Metropolitan Company (the predecessor of the Interborough Consolidated Company).

(3) Receivers were appointed of the City Company on September 4, 1907, and of the Metropolitan Company on October 1, 1907. In 1908 the receivers of the City Company were directed by the court to bring the action at law and suit in equity.

(4) The action at law was based upon the breach of a contract between the City Company and the Securities Company, by the terms of which the Securities Company agreed to furnish certain funds to the City Company in return for securities of the Metropolitan Company which the City Company agreed to deliver to the Securities Company. Judgment for the plaintiff was recovered in the circuit Court (Joline v. Metropolitan Securities Co., 164 Fed. 144), and an appeal was taken to the Circuit Court of Appeals, where the judgment was affirmed (Metropolitan Securities Co. v. Ladd, 173 Fed. 269, 97 C. C. A. 435), and then certiorari was denied by the Supreme Court of the United States (215 U. S. 603, 30 Sup. Ct. 405, 54 L. Ed. 345).

(5) In the suit in equity the receiver of the City Company brought suit against the directors of the City Company, seeking to charge them with the loss suffered by the City Company in a transaction whereby it sold 10-year 3 per cent. debentures at 70 and redeemed them within a year at par. The testimony had been taken in the suit, and the record was ready for submission when a compromise of both the action at law and the suit in equity was brought about.

(6) The compromise was approved by order of the Circuit Court for the Southern District of New York filed July 8, 1910. Copies of the petition of the receiver of the City Company filed June 29, 1910, of the opinion of Judge Lacombe thereon filed July 8, 1910, and of the order filed July 8, 1910, approving the compromise, are on file in this court.

(7) As a result of the compromise there came into the hands of the receiver of the City Company cash in excess of $5,500,000, certain securities, and certain real estate, which were available for distribution among the creditors of the City Company.

(8) In the so-called apportionment proceeding the Circuit Court of Appeals (Pennsylvania Steel Co. v. New York City Ry. Co., 198 Fed. 778, 117 C. C. A. 560), divided between the action at law and the suit in equity the amount received in settlement. It also decided that the proceeds of the action at law were (after reimbursing the city receiver for certain capital expenditures made prior to the receivership by the City Company upon the Metropolitan properties) held in trust by the city receiver for the benefit of the Metropolitan Company, and that this sum should go to the general creditors, and not to the mort-

gage bondholders, of the Metropolitan Company. See Pennsylvania Steel Co. v. New York City Ry. Co., 198 Fed. 778, 117 C. C. A. 560; also Pennsylvania Steel Co. v. New York City Ry. Co., 206 Fed. 663, 124 C. C. A. 463.

There were several classes of general creditors and many creditors and many claims; and, when the physical properties which belonged to the Metropolitan Company were on January 1, 1912, delivered to the Railways Company, these claims were in process of liquidation, but that liquidation had not been completed, nor was it then possible to determine accurately the value of these claims.

Prior to January, 1912, a joint reorganization committee had been organized, and this committee put forward under date of November 29, 1911, a "plan and agreement for the reorganization of the Metropolitan Street Railways Company."

Certain of the features of the plan and agreement will be referred to later, but at this point it is important to emphasize that nowhere in this plan can warrant be found for the contention that it was intended to subject (1), (2), and (3) of the exception clause to the lien of the mortgage.

In view of the foregoing history and the unliquidated situation, it must be concluded that the exception clause was intended to and effectually did exclude the property therein mentioned, not only then, but for all time, from the lien of the first mortgage, unless it were thereafter drawn under that lien by some affirmative acts strictly in accordance with the provisions of the mortgage.

It is next necessary to ascertain what particular property was excepted.

First. It is agreed by all that 3,000 shares of Central Park North & East River Railroad Company stock, which were owned by Railways Company on January 1, 1912, and not specifically described in the mortgage, are not subject to the lien of the mortgage and is within the exception.

[3] Second. What was the chose of action which was excepted? The plan and agreement of November 29, 1911, is the foundation of all which was afterwards done. The joint committee was the committee created by the so-called 5 per cent. committee and the so-called 4 cent. committee, these two committees representing respectively the bondholders of the mortgage of February 1, 1897, and of the mortgage of March 21, 1902. As will presently appear, the plan proposed the formation of a new railroad corporation under sections 9 and 10 of the New York Stock Corporation Law (Consol. Laws, c. 59). These sections provide the machinery for a reorganization upon the sale of corporate property and franchises where, inter alia, such property and franchises are sold pursuant to the judgment or decree of a court of competent jurisdiction.

In section 9 it is provided that—

"Such corporation shall be vested with, and be entitled to exercise and enjoy, all the rights, privileges and franchises, which at the time of such sale belonged to, or were vested in the corporation last owning the property sold, or its receiver, and shall be subject to all the provisions, duties and liabilities imposed by law on that corporation."

Under section 10 it is provided that—

"At or previous to the sale the purchasers thereat, * * * may enter into a plan or agreement, for or in anticipation of the readjustment of the respective interests therein of any creditors, mortgagees, stockholders, * * * of the corporation owning such property and franchises at the time of the sale, and of holders of claims for materials, supplies and equipment furnished, and for injuries and damages sustained. * * * Such plan or agreement * * * shall be binding upon the corporation, until changed as therein provided, or as otherwise provided by law."

From the foregoing it will be seen at once how vital are the plan and the agreement of November 29, 1911, as aids in ascertaining to what the first mortgage referred when it excepted "choses in action * * * owned by the company at the date hereof not in this indenture elsewhere enumerated or specifically described. * * *" The plan contains this clause:

"It is proposed that a new railroad corporation shall be formed under the provisions of sections 9 and 10 of the Stock Corporation Law of New York, and to vest in it the ownership or control of the properties described in said decrees and constituting a part of or pertaining to said Metropolitan system as the same may be acquired by or on behalf of the joint committee at sales under said foreclosure decrees or otherwise, together with all the rights of the old securities acquired by the joint committee in exchange for new securities under the provisions of this plan, subject to the right of joint committee to deal with and dispose of the stocks, bonds, claims, choses in action, and other intangible rights acquired by the purchaser in such manner as the said committee may deem expedient in effectuating the purposes of the plan and the matters therein provided for."

There is only one reference to the Ladd fund in the estimate of cash requirements to carry out the plan, as follows:

"Out of this fund (i. e., the estimate of cash requirements) and the very substantial other funds in the hands of the court which are believed to be available for that purpose, the outstanding receivers' certificates (substantially $5,880,000), claims adjudged or which may be adjudged to be preferential, receivers' liabilities and obligations, costs, allowances, and other sums ordered to be paid by the court will have to be met."

The plan, of course, refers to the proposed issue of the first mortgage bonds and the adjustment bonds. It says:

"Mortgages to secure the aforesaid first real estate and refunding (prior lien) bonds and adjustment (next lien) bonds shall cover all property of the new company therein described and shall be in such form as the joint committee may prescribe."

The plan further provides:

"The estimate of cash requirements made herein is believed to be a fair one. Under the terms of said decrees of foreclosure, however, the purchasers may be called on to make up a sum in excess thereof. In order to raise any additional moneys which may be necessary to comply with the terms of said decrees, carry out the reorganization, or to carry out the purposes of, or discharge the liabilities of, the reorganization and to pay its expenses, the joint committee may, in its uncontrolled discretion, cause the new company (as and to the extent and in the manner permitted or prescribed by law) to issue and sell or dispose of additional securities to such extent as they may deem neces-

sary or wise, to consist of additional new 4 per cent. bonds or other obligations beyond those hereinabove mentioned. The joint committee or the new company may use or dispose of any assets or the proceeds of assets obtained by the foreclosure sales or through deficiency judgments thereon or otherwise in the possession of the committee or its agents or the new company for any purpose which it may deem advantageous for the reorganization."

The plan further says:

"All bonds, shares of stock, notes, and tort claims deposited or acquired pursuant to this plan (including all 5 per cent. bonds and 4 per cent. bonds remaining in the hands of the joint committee or the hands of the 5 per cent. committee or the 4 per cent. committee received in exchange for securities allotted under this plan, together with all rights appertaining thereto, excepting to participate in cash held by the trustees under the mortgages respectively securing the same, which cash, if any, will be distributed by said trustees to the persons respectively entitled thereto) shall be dealt with and disposed of as the joint committee may deem expedient in effectuating the purposes of the plan and the matters therein provided for, and the joint committee shall have authority, in its discretion, to vest such power in the new company."

The agreement annexed to the plan provides as follows:

"Tenth. Any balance of cash received by the joint committee and any balance of securities remaining in the hands of the joint committee (including 5 per cent. bonds and 4 per cent. bonds remaining in the hands of the joint committee or the 5 per cent. committee or the 4 per cent. committee received in exchange for securities allotted under the plan, together with all rights appertaining thereto, excepting to participate in cash held by the trustees under the mortgages respectively securing the same) after paying or fully providing for all sums payable under the decrees or the purchase price of property to be acquired under the plan, and all obligations and expenses of the joint committee, including the compensation of the syndicate hereinbefore mentioned, and the compensation and expenses of the depositaries and of the joint committee, and of the 5 per cent. committee and of the 4 per cent. committee, may be turned over by the joint committee to the new company."

There does not seem to be in the plan or agreement any specific statement or representation that the old bonds, tort claims, etc., which were entitled to participate in the Ladd fund should be assigned to the trustee of the mortgage.

The foreclosure sale took place on December 29, 1911. On that day the purchasers acquired at the sale the physical property of the Metropolitan; also the stocks and bonds of the controlled companies. The purchasers acquired nothing else. At the time of the sale the joint committee had a large majority of the old 5 per cent. bonds and a large majority of the old 4 per cent. bonds. It also had many millions of notes, contract claims, and tort claims against the Metropolitan Company and against the New York City Company, which had for some years been the operating company. These old deposited securities and claims were at this time of a vague and uncertain value. Some of these were claims directly against the New York City Company and entitled to participate in its general assets. Some of them were claims against the Metropolitan Company and entitled to participate in its general or unmortgaged assets. Metropolitan Company had a very large claim against the City Company, so that, indirectly, all the claims against the Metropolitan

277 F.—18

Company were entitled to share in the assets of the City Company, if any.

The purchasers at the foreclosure sale did not acquire any interest in this mass of claims, and did not, when they turned over what they purchased to the new Railways Company, give that company any interest therein. All interest in these claims remained in the joint committee, except as the joint committee might part with it to the Railways Company. Previous to the sale there was an agreement of readjustment dated December 27, 1911. That agreement was between the 5 per cent. committee, the 4 per cent. committee, and the joint committee. It declared the plan and agreement of reorganization effective. It designated the purchasing committee and contemplated that the purchasers should purchase the property at the foreclosure sale. It contemplated that the purchasers should form a new company and, further, that the "new company," in consideration of the transfer of the property acquired by the purchasers, should issue to the purchasers the new 4 per cent. bonds, the new adjustment bonds, and the new stock. Article IV described the new mortgage, and, for instance, provided that the new 4 per cent. mortgage—

"shall cover such property vested in or acquired by the new company as may be prescribed or approved by the joint committee."

Article VII provided at the time the purchasers conveyed to the new company that—

"The joint committee may turn over to the new company, for immediate working capital, such amount of the funds from time to time in the possession of the joint committee as it may deem advisable."

This article further provided:

"Upon or before the final accounting provided for in said plan and agreement of November 29, 1911 [Note.—This would seem to be article tenth of the agreement, referred to supra], the joint committee shall have power to assign and deliver to the new company, or set apart and hold or deposit in trust to secure the application thereof to any of the purposes of said plan and agreement or for the uses of the new company, in such manner as the joint committee may deem best, any balance of cash received by the joint committee under said plan and agreement of November 29, 1911, from assessments therein provided for or other source, and any balance of bonds, stocks, notes, claims, or other assets remaining in the hands of the joint committee (including 5 per cent. bonds and 4 per cent. bonds remaining in its hands or those of the 5 per cent. committee or the 4 per cent. committee received in exchange for securities allotted under the said plan and agreement, together with all rights appurtenant thereto, excepting to participate in cash held by the trustees under the mortgages respectively securing the same), whether received from said new company or acquired by the joint committee under said plan and agreement.  *  *  *"

Here followed the various things the joint committee was to do with the new securities, paying the expenses of the purchase and the expenses of the reorganization, etc.

In pursuance of this agreement of readjustment, the purchasers bought the property at the foreclosure sale, organized the new company—i. e., Railways Company—and conveyed to it the property so

purchased by them. This is recited in the first mortgage. But in addition to this deed direct from the purchasers to the new company, there was another agreement made, called "agreement of sale to new company by purchasers under foreclosure decree." This was an agreement made between the purchasers, the joint committee, and the new company, dated December 30, 1911. Under article V the joint committee agreed as follows:

"Upon the final accounting provided for in said plan and agreement of November 29, 1911. the joint committee shall assign and deliver to the company, or set apart and hold or deposit in trust to secure the application thereof to any of the purposes of said plan and agreement or for the uses of the company, in such manner as the joint committee may deem best, any balance of cash received by the joint committee under said plan and agreement of November 29, 1911, from assessments therein provided for or other source, and any 5 per cent. bonds and 4 per cent. bonds, or other bonds, remaining in its hands or in those of the 5 per cent. committee or the 4 per cent. committee, and of any stocks, notes, claims, or other assets received in exchange for securities allotted under the said plan and agreement, together with all rights appurtenant thereto (except the right to participate in cash held by the trustees under the mortgages respectively securing the said bonds) or acquired by the joint committee under said plan and agreement, after.  *  *  *"

Here follows provision for the payment of the various obligations, etc.. and for discharging the duties of the joint committee.

This is the chose in action under which the Railways Company acquired its right to receive the old funds in the hands of the court or the receivers.

The first mortgage recites the various agreements. It recites that the purchasers became incorporated under the name of the "New York Railways Company," and that the company acquired all the property from the purchasers. It then recites that, under the agreement of sale above mentioned, the company was obligated to deliver its bonds in part consideration of and in part payment of said property and franchises.

There is no language in the recitals nor in any other part of the mortgage to show that the Railways Company intended to mortgage the property which it would acquire from the joint committee. On the contrary, the reference to "choses in action" in the exception clause and the history and surrounding circumstances point inevitably to the conclusion that it was the scheme of the mortgage not to include the property which was to be acquired from the joint committee whenever the joint committee was so positioned that it could turn over property, whether cash, real estate, claims, or securities to the Railways Company.

Whether, therefore, such property be characterized as the product of the chose in action or as "cash, or any claims to cash or the proceeds of assets when reduced to cash in the hands of the court or the receivers,  *  *  *" the result is the same.

Third. Attached hereto and made part hereof is the carefully prepared and highly useful "analysis" submitted by counsel for the receivers.[1]

----

[1] See note at end of case.

Reference to the "analysis" will show that the following items of property (omitting those said to be of no value) fall under the "choses in action" and/or (1), (2), (3) provisions of the exception clause:

A. Property acquired from the Ladd fund in kind and now held by Railways Company: (a) Twenty-Third Street Railways bonds. Par value, $50,000 (Analysis, p. 2, No. 1). (b) Mt. Vernon property (Analysis, p. 4, No. 1). (c) Lenox avenue, 140th and 141st street property (Analysis, p. 4, No. 2).

B. (a) Eighth Avenue Railroad Company fire loss fund in litigation (Analysis, p. 4). (b) Long Island Fertilizer Company fund, ultimate status undecided (Analysis, p. 4). (c) Central Crosstown fund (Analysis, p. 4).

[4] Fourth. Turning now to property bought with general cash, it may be well at this point to note the cash situation arising out of the decree of February 15, 1916. Prior to March 21, 1919, the date of the appointment of Receiver Hedges, the Metropolitan and City receivers had turned over to the Railways Company the sum of $5,629,685.25. After March 21, 1919, a further sum of $45,733.26 was turned over to Receiver Hedges, thus making a total of $5,675,418.51 in cash derived from the Metropolitan litigation. This sum was applied as follows:

(Exhibit 53, Schedule I, and Contract Creditors' Exhibit AB–5.)

| | |
|---|---:|
| To the purchase of claims against Metropolitan and New York City Railway Companies, aggregating ...................... | $1,570,598.03 |
| To the purchase of $1,000,000 par value of Railways Company 4 per cent. bonds, infra ................................... | 783,108.85 |
| To the payment of the so-called Oren Root real estate mortgage, infra ................................................. | 950,000.00 |
| To the payment of note of joint reorganization committee...... | 650,000.00 |
| To the payment on March 22, 1916, to receiver of Metropolitan Street Railway Company of balance due on current account. This was first paid out of general cash and general cash was in turn reimbursed from the receivership settlement fund.... | 33,231.45 |
| To the payment of sundry expenses of receivership litigation.... | 23,787.63 |
| Advanced to general cash for working capital purposes......... | 1,618,959.29 |
| Added to general cash of Hedges, as receiver of the Railways Company ............................................. | 45,733.26 |

In March, 1912, and May, 1913, $600,000 par value of Metropolitan Crosstown Railway Company first mortgage 5 per cent. bonds were acquired out of general cash (Analysis, p. 3, No. 18).

In September, 1918, $210,000 par value Christopher & Tenth Street Railway Company first mortgage 4 per cent. bonds were acquired out of general cash (Analysis, p. 2, No. 6). The maturity date of these bonds at the time of the execution of the first mortgage was October 1, 1918, but that date was extended until 1923.

Under article second, section 3, of the mortgage it was provided:

"Bonds hereby secured shall be * * * delivered from time to time as provided in section 4 of this article second, and not otherwise, for the following purposes: * * *

(a) To refund, pay, redeem, purchase, or otherwise acquire the following outstanding bonds, * * * to wit:

"$600,000 5 per cent. first mortgage bonds of the Metropolitan Crosstown Railway Company due April 1, 1920. * * *

"(c) At the option of the company to refund, pay, redeem, purchase, or otherwise acquire * * * the following described bonds: * * *

"$210,000 of the 4 per cent. extended bonds of the Christopher & Tenth Street Railroad Company, due October 1, 1918. * * *"

Section 4 of article second provided:

"(a) Whenever the company shall deliver * * * to the trustee for the purposes hereinbefore in section 3 of this article second mentioned * * * any of the said bonds * * * referred to in said section 3 of this article second, * * * the trustee, in exchange therefor, upon the request of the company evidenced by resolution of its board of directors, shall, subject to the provisions of paragraph (e) of this section 4, authenticate and thereupon deliver to the company * * * bonds secured hereby in an aggregate principal sum equal to the amount authorized to be authenticated and delivered for such purpose under the provisions of paragraph (e) of this section 4."

"(c) Each and every underlying bond which shall be deposited with the trustee under the provisions of this article second shall be by the trustees stamped with substantially the following words: 'Not negotiable. Held in trust for the purposes declared in the first real estate and refunding mortgage of New York Railways Company, dated January 1, 1912,' * * * and shall be held by the trustee as purchaser, without merger or extinguishment or impairment of lien, in uncanceled form, as part of the security for the bonds issued and to be issued under this indenture unless and until otherwise disposed of as in this indenture authorized or directed."

"(e) Before authenticating or delivering to the company, or on its order, any of the bonds provided to be issued for the purposes mentioned in the foregoing section 3, there shall be delivered to the trustee, in addition to the bonds or cash as hereinbefore required:

"(1) A copy of a resolution or resolutions of the board of directors of the company, * * * requesting the trustee to authenticate and deliver a specified amount of said bonds for one or more of the purposes for which such bonds may be issued, and stating that said amount of bonds is required to refund, pay, redeem, purchase, or otherwise acquire said underlying or subsidiary bonds. * * *"

From all of the foregoing (including the procedural provisions of section 4, not quoted) it is apparent that the scheme of the mortgage was that first mortgage bonds should be delivered against, inter alia, the Metropolitan Crosstown and Christopher & Tenth Street bonds (see, also, paragraph V and Schedule A of reorganization plan and paragraph sixth of the agreement).

When, therefore, these bonds were acquired out of cash, they could not go under the mortgage unless the trustee paid for them by the delivery of first mortgage bonds, in accordance with the provisions of the mortgage supra. This is the controlling reason why the Metropolitan Crosstown and Christopher & Tenth Street Railroad Company bonds are not under the mortgage, although much might be said as to the practical construction of the status of the Metropolitan Crosstown bonds between plaintiff as a banker and the Railways Co. See Mr. Chadbourne's Brief, pp. 26 and 27.

Fifth. 100 shares of Thirty-Fourth Street Crosstown stock par value $10,000 and 2 shares of Broadway and Seventh Avenue Company capital stock, par value $200 (Analysis, p. 2, Nos. 2 and 3), were acquired out of general cash in December, 1913, and are now in the treasury of the Railways Company. These fall under section 5, quot-

ed supra, and, as no bonds were delivered against them, they are not under the mortgage.

Sixth. *The Oren Root Mortgage.*—Under section 3 (a), quoted supra, it was contemplated that bonds should be issued to acquire the "$950,000 bond of Oren Root, Jr., : * * * secured by mortgage to the Mutual Life Insurance Company * * * on parcels 1 and 2 of lot 2"—i. e., the Eighty-Fifth and Eighty-Sixth streets and Madison avenue property and the Thirty-Third street property, Madison and Lexington avenue property. Instead, however, of paying off this mortgage with first mortgage bonds, the Railways Company paid it out of the Ladd fund.

The minutes of the meeting of the board of directors of the Railways Company on September 6, 1916, show the action taken as follows:

"Mr. Theodore P. Shonts in the chair.

The president laid before the board the matter of the distribution of the cash, claims for cash, and proceeds of assets when reduced to cash which were in the hands of the court or the receivers of the Metropolitan Street Railway Company or the New York City Railway Company, and which as a result of the amicable adjustment of the receivership litigation had accrued, in the amount of approximately $4,100,000 actually collected or yet to be drawn down, to the benefit of this company. He stated that the matter of the distribution of this cash had been, under direction of the board, under consideration by himself and director Cobb; that they had been advised by counsel that under the provisions of the adjustment mortgage the funds and property in question were not part of the mortgaged property, and therefore that the income thereof did not accrue to the benefit of the adjustment bondholders. He further stated, however, that the fund was at the present time drawing only banker's interest, and not yielding the return which would be possible if it were invested; that the mortgage provided that this fund should be disposed of by a vote of not less than three-fourths of the directors of the company; that he was prepared to recommend as an adjustment of the question that so much of the fund as was necessary to pay off the bond of Oren Root, guaranteed by the Metropolitan Street Railway Company, and due, as extended, to the Mutual Life Insurance Company, on the 15th instant, amounting to $950,000, and to pay off the demand note of this company to the Guaranty Trust Company executed by the reorganization committee of the Metropolitan Street Railway Company for the purpose of meeting reorganization expenses, amounting to $650,000, should be applied to said purposes, the result of such action inuring to the benefit of the adjustment bondholders, but that the remainder of the said fund should be set apart and invested for the corporate purposes of the company, the income and profit therefrom not to be a part of the mortgaged estate, and not to be distributable to the adjustment bondholders, but to be added to the surplus of the company. Director Cobb having expressed his approval of the distribution as recommended, it was thereupon unanimously resolved that so much of the fund constituting cash, or any claims for cash, or the proceeds of assets when reduced to cash, in the hands of the court or the receivers of the Metropolitan Street Railway Company, or W. W. Ladd, as receiver of the New York City Railway Company, which sums as a result of the settlement of the Metropolitan and New York City Railway receiverships had accrued to and been paid over to the New York Railways Company, be, and the same hereby is, appropriated as follows:

"First. Under subsection 1, clause 'b,' section 6, of article third of the adjustment mortgage, to the payment of a note of $650,000 executed by the joint reorganization committee of the Metropolitan Street Railway Company for the purpose of providing funds to meet the expenses of reorganization.

"Second. Under clause 'c' of said section and article, to the payment of a bond of Oren Root, guaranteed by the Metropolitan Street Railway Com-

pany, and secured by a pledge upon real estate of the company at Thirty-Fourth street and Lexington avenue and at Eighty-Sixth street and Park avenue, in the principal amount of $950,000.

"Third. That the balance of said fund, including any invested part thereof, be set aside and held for the corporate purposes of the company, to be invested, expended, or applied in the discretion of the officers of the company, as approved by a majority vote of the directors present at a duly called meeting: the earnings therefrom not to be included as any part of the earnings from the mortgaged estate."

In pursuance of the foregoing the Root mortgage was paid off, and the equity of the first mortgage was enhanced accordingly without the Railways Company receiving first mortgage bonds therefor, whether resort is had to section 3 of article second or to section 2 of article third of the first mortgage. (As the lien of the adjustment mortgage is not now under consideration, no comment is made at this time in respect thereof.)

It is obvious that this payment "fed" the mortgage at the expense of the Railways Company, but, whether this is a diversion, and, if so, whether there is redress therefor available to the general creditors, tort and contract, must be left for determination to the accounting. At this stage there is no lien in favor of general creditors, nor is there a specific trust fund of this amount earmarked for their benefit. The rights of all concerned must be adjudicated when and if a fund is produced by foreclosure sale. The payment of the Root mortgage presents questions of fact and law on the accounting in regard to which no opinion is now expressed.

*Funds Derived from the City of New York from Special Franchise Tax Refunds* (Analysis, p. 4).—The questions arising hereunder have not been adjudicated, but it is expected that they will be decided by this court before it makes any final decree. If not, it may be well to provide for the sale of all the right, title, and interest, if any, of the trustee in said refunds; but that detail may be deferred for the present.

[5] Seventh. *Cash.*—It is necessarily and frankly conceded by counsel for the trustee that the mortgage does not cover "income, profits of operation of the company which were in existence and in possession of the company at any time prior to the taking possession of the receiver as receiver under the refunding mortgage on July 14, 1919."

Cash, qua cash, could not be mortgaged. This proposition needs little argument to sustain it. Cash is variable and shifting. Because it is a "free asset," it is, and properly may be, relied upon by creditors or taken into consideration when they extend credit. It must be used to pay obligations and liabilities arising out of contract or tort. It must be under full control of the corporation, else the corporation cannot do business. "Cash," however, is not necessarily so many physical dollars represented by currency or by bank deposits. Security used for certain purposes in lieu of cash may be "cash" in the sense in which we refer to nonmortgageable property.

Thus the $82,000 of city bonds deposited with the State Industrial Commission (Analysis, p. 2, No. 7) must be regarded as cash. In order to comply with the requirements of the New York law and the

Industrial Commission, the Railways Company had the choice of depositing cash or securities. This was a transaction in the ordinary course of business, no different in principle from meeting a payroll. These bonds at any time could have been drawn down and sold and cash deposited in their stead. They do not come under the mortgage, not because they were acquired with cash, but because they were cash for all practical purposes. So, too, with the Liberty bonds of $2,550 par value (Analysis, p. 2, No. 8). These were acquired, no doubt, in response to the nation's appeal. They could have been sold at any time, but they were retained in part in the treasury and in part in lieu of cash for deposit with the city comptroller.

[6] Eighth. *Materials and Supplies* (Analysis, p. 4).—The testimony of O'Connor, general storekeeper for the Railways Company and later for Receiver Hedges, shows that the materials and supplies were "mostly in current use and reserve." There were necessarily in reserve materials and supplies which must be on hand so as to be available at any moment. The reserve supplies, according to O'Connor, "are what is termed 'stock'; they are shifting supplies that are renewed from time to time as the quantity on hand is used up or put to use." On any particular date, therefore, there would necessarily be on hand certain materials and supplies which would not at the moment be physically in use or operation. In other words, there might be a rail in the warehouse or a ton of coal physically detached from operation, but necessary for operation at any moment. It is, of course, settled that the New York rule is that a chattel mortgage of after-acquired property is ineffective as against creditors of the mortgagor, and that some further act is necessary in order to make it an effective lien as against creditors. This general rule has been followed in this circuit. In re P. J. Sullivan Co., 254 Fed. 660, at page 662 et seq., 166 C. C. A. 158; Westinghouse, etc., v. B. R. T. (C. C. A.) 263 Fed. 532, at page 537 et seq. But to this rule there is an exception well expressed in Platt v. New York, Sea Beach R. Co., 9 App. Div. 87, 41 N. Y. Supp. 42, affirmed on opinion below 153 N. Y. 670, 48 N. E. 1106. There is nothing in the B. R. T. Case (C. C. A.) 263 Fed. 532, in opposition to the Platt Case. There the question was quite different, and B. R. T. was a holding company, and not a railroad corporation, and the property discussed was not equipment, materials and supplies for a railroad.

Obviously, if an old rail is replaced by a new rail, the effectiveness of a railroad mortgage would be greatly impaired or destroyed if the new rail escaped the lien of the mortgage. The test is whether the materials and supplies are of a character necessary and appropriate for railroad purposes and are intended for use on the railroad for such purposes. If materials and supplies were bought to sell or for speculation, the question would be different. Then the railroad would become a dealer or speculator in materials and supplies and not a user thereof.

The theory is that there is no intent to substitute the supplies and materials for cash (as in the case of the City and Liberty bonds, supra),

but to use them in connection with the construction or operation of the road. In such circumstances it would be highly illogical and drawing an overfine technical distinction to say that the rail in the warehouse which may be needed any moment is not a part of the plant in operation because on a particular day it was not physically affixed or actually used in operation. Of course, the materials and supplies must be such as in the exercise of fair discretion should be kept on hand. If cash has been depleted by improvident purchases in excess of needs justified by prudent foresight, the case may be one of diversion, but that question, if it should arise, must necessarily be left to the accounting. It is therefore held that under the after-acquired clause the lien of the mortgage covers "materials and supplies."

[7] Ninth. *The $1,000,000 of First Mortgage Bonds.*—These bonds are now pledged with plaintiff in its independent capacity as a banker as collateral security to a loan to Railways Company. The following is their history:

At a meeting of the board of directors of the Railways Company on May 23, 1916, it was resolved:

"That the officers of this company be, and they hereby are, authorized to purchase one million dollars ($1,000,000) face value of the 4 per cent. first real estate and refunding mortgage bonds of this company at an average cost of not exceeding 80 per centum out of the undistributed fund recovered by virtue of the adjustment and settlement of the Metropolitan Company and New York City Company receiverships, and that any previous action taken by the officers of this company in investing any portion of the undistributed fund in the bonds upon the aforesaid basis be. and the same hereby is, ratified and approved, the said bonds to be subject to distribution under the mortgages of this company in the same manner as the cash fund."

It will thus be noted that these bonds were purchased with money derived from the Ladd fund, and for reasons supra were not, therefore, under the mortgage. $783,108.85 of the Ladd fund were used for this purpose.

For a time the bonds were held in the treasury of the Railways Company. Thereafter these bonds and a certificate of deposit of $800,000 were pledged with Guaranty Trust Company to secure a loan of $1,200,000. Later this loan was reduced to $400,000 by the application of the certificate of deposit to its reduction, and the trust company now holds these bonds and is asserting a lien upon them to secure the payment of $400,000 still due.

Plaintiff, of course, cannot and does not claim a lien on these bonds, but insists that the bonds are outstanding. Some of the defendants, however (particularly the adjustment mortgagee), contend that the bonds were extinguished, and, inter alia, point to certain correspondence between the Trust Company and Railways Company as disclosing the intent of the Railways Company. In my opinion, however, the record plainly indicates that it was the intention of Railways Company to keep these bonds alive. Such a course is both lawful and proper. It is always a question of intention. Jones on Corporate Bonds and Mortgages has put the point clearly and succinctly, and he is well supported by the cases. He says:

"Sec. 325. A company may purchase its own bonds as an investment and reissue them. If the facts show that there was no intention of paying the bonds, but they were regarded and reported by the company as still outstanding, they are valid in the hands of a subsequent purchaser and are secured by the lien of the mortgage."

In Barry v. Missouri, K. & T. Ry. Co. (C. C.) 34 Fed. 829, Judge Wallace said:

"There is no principle in law of corporations or of mortgages which forbids a corporation that has issued a series of mortgage bonds from purchasing a part of them back and reissuing them before their maturity, when the financial interests of the corporation will thereby be promoted, unless the organic law of the corporation prohibits the exercise of such a power."

See Atlantic Trust Co. v. Woodbridge Canal Co. (C. C.) 79 Fed. 842; Memphis, etc., R. R. Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, 30 L. Ed. 595; Progressive Wall Paper Case, 229 Fed. 489, 143 C. C. A. 557, L. R. A. 1916E, 563.

There are bonds thus outstanding to the extent of $18,019,948.24. But a bond cannot be outstanding and yet not outstanding. It is either dead or alive. If alive, it is entitled to share in the proceeds of the foreclosure sale. The situation merely is that plaintiff owns seventeen-eighteenths, in round numbers, and Railways Company owns one-eighteenth, in round numbers, subject to the $400,000 pledge. All the mortgaged property is security for the whole eighteen-eighteenths. Hence plaintiff will be entitled to seventeen-eighteenths and Railways Company (which, in the circumstances, means its creditors) to one-eighteenth, in round numbers, of such sum produced by foreclosure sale, as ultimately may be held to be applicable to the payment of the mortgage debt.

After, therefore, the $400,000 shall have been paid, the proportionate balance, if any, will go to the Railways Company, and will be applicable to the payment of general creditors' claims as between this plaintiff and defendant Railways Company.

Tenth. As there are other questions outstanding and undetermined, this opinion at this time cannot result in a final decree, and can only be regarded as advisory.

I have not mentioned some of the so-called valueless properties, but they can be readily classified in accordance herewith. My suggestion is that the conclusions here stated shall be embodied in an order for purposes of clear understanding hereafter.

I would have preferred that this opinion should have been less lengthy but for the fact that there are many documents, and I have thought that the quotations might save counsel time and be of convenient service.

I take this opportunity of expressing my appreciation to all counsel for their able presentations and briefs, and I think all will agree that court and counsel are greatly indebted to Mr. Winthrop and Mr. Roberts for their painstaking and highly valuable co-operation and assistance.

# NOTE.

## Analysis of Property Claimed to be Excepted from the Lien of the Guaranty Trust Company Mortgage.

### EXPLANATION.

The Tort Creditors and Contract Creditors claim that certain properties, alleged in the proposed decree to be covered by the mortgage, are not so covered because:

(A) They constitute cash or accounts receivable representing income earned before the appointment of the receiver, or cash either released by its terms from the lien of the mortgage or not capable of being mortgaged as a matter of law. (See Tort Creditors' Brief, p. 4; Contract Creditors' Brief, Points I and II, pp. 10 et seq., and 18 et seq., and First and Refunding Mortgage Trustee's Brief, p. 11 et seq.)

or because

(B) They constitute property specifically excepted by the terms of the mortgage, on account of being the proceeds of a chose in action against the so-called Joint Committee, owned by the company at the date of the mortgage and not therein specifically described or "of assets when reduced to cash, in the hands of the court, etc." (See Tort Creditors' Brief, p. 7 et seq.) opposing argument in First and Refunding Mortgage Trustee's Brief, p. 11, and

or because

(C) They constitute stocks or bonds or choses in action not intended to be covered by the general language of the after-acquired clauses. (See Tort Creditors' Brief, p. 15; Contract Creditors' Brief, pp. 22 et seq. and 34 et seq., and opposing argument in First and Refunding Mortgage Trustee's Brief, pp. 2 to 16.)

or because

(D) They constitute after-acquired property, consisting of securities, reserve materials and supplies, and land, which were not a part of the plant in operation when the receiver was appointed, and, therefore, as a matter of law, not covered by the mortgage as against creditors. (See Tort Creditors' Brief, pp. 10 and 11; Contract Creditors' Brief, Point VI et seq., and opposing argument in First and Refunding Mortgage Trustee's Brief, p. 16 et seq.)

or because

(E) They constitute a shifting stock of goods not subject to the mortgage as a matter of law. (See Contract Creditors' Brief, p. 30.) Counsel for the Receiver have therefore prepared this schedule, in which there have been itemized the various properties which are claimed not to be covered by the mortgage. Under the column marked "Location in Decree" we have indicated the place in the proposed decree where the property is alleged to be covered by the lien of the mortgage. Under the column "History of Item" we have briefly described the acquisition and its present status. By "Evidence" we refer to the exhibits or evidence which describes the property. Finally under "Alleged Reasons Why Not Covered by the Lien" we have referred to the arguments, as lettered above, on account of which the property is claimed not to be covered by the mortgage.

### I. CASH.

| | Liens | History of Item | Evidence |
|---|---|---|---|
| 1 | All cash and accounts receivable on hand at the time of the appointment of the receiver. | In January, 1912, there was received from the Joint Committee on Reorganization on account $500,000 for working capital. At various other times there was secured from said company amounts totaling $51,497.24. These amounts are reflected in the current account. On March 22, 1916, there was received by the New York City Railway Company, the Metropolitan Street Railway Company or from the Special Master $6,336,697.88. Of this $1,613,959.29 was set apart, in accordance with the mortgage, as "cash capital," at a directors' meeting on September 6, 1916. There is no evidence that any cash specifically covered by the mortgage was added to this fund. At the commencement of the receivership in the creditors' cause the general cash on hand equalled $108,222.25 and petty cash equalled $28,262.73. When the receiver was appointed, the general cash equalled $1,317,874.33 and petty cash equalled $28,455.23. In addition there were outstanding certain accounts receivable which may be classified under this heading. | See Exhibit #33, item 33. See Exhibit #33, Item 28, and especially Sched- ule 1 to Ex- hibit #33. See Exhibit BB, page 26 of his brief. See Argument A. The First and Re- funding Mort- gage Trustee admits in part the principles alleged. See Mr. Samuel- son's testimony, pages 93 and 94. |

## II. STOCKS AND BONDS.

| No. | Item | No. of Shares or-Bonds | Face or Par Value | Location in Decree | History of Item | Evidence | Alleged Reasons Why Not Covered by the Lien |
|---|---|---|---|---|---|---|---|
| 1 | Twenty-third Street Railway Company Bonds due Jan. 1, 1909 | 50 | $ 50,000.00 | Part of Lot Nine, Parcel 3, page 42 | These bonds were turned over by the Receiver of the Metropolitan Street Railway Company to New York Railways Company under Receivership Settlement of March 22, 1916. They are now in the Treasury of the New York Railways | See Exhibit BB, See Exhibit #53, Item #1, See Exhibit #56, Item #1 | See Arguments B, C and D |
| 2 | Thirty-fourth Street Crosstown Railway Company Stock | 100 | 10,000.00 | Part of Lot One, Parcel 28, page 25 | Acquired with general cash, December, 1913—in Treasury | See Exhibit #53, Item #10, See Exhibit #53, Item #10 | See Arguments C and D |
| 3 | The Broadway & Seventh Avenue Railroad Company Capital Stock | 2 | 200.00 | Part of Lot One, Parcel 26, page 25 | Acquired with general cash, December, 1913—in Treasury | See Exhibit #53, Item #9, See Exhibit #56, Item #9 | See Arguments C and D |
| 4 | The Brooklyn & North River Railroad Company Capital Stock | 250 | 25,000.00 | Lot Fifteen, Parcel 2, page 51 | Acquired with general cash, December, 1913—now in Treasury | See Exhibit #53, Item #2, See Exhibit #56, Item #2 | See Arguments C and D |
| 5 | Bridge Operating Company Capital Stock | 500 | 50,000.00 | Lot Fifteen, Parcel 3 | Acquired with general cash, January, 1914—now in Treasury | See Exhibit #53, Item #3, See Exhibit #56, Item #3 | See Arguments C and D |
| 6 | Christopher & Tenth Street Railroad Company First Mortgage 4% Bonds due 1923 | | 210,000.00 | Lot Fifteen, Parcel 4 | Acquired with general cash, September, 1918—now in Treasury | See Exhibit #53, Item #4, See Exhibit #56, Item #4 | See Arguments C and D |
| 7 | City of New York 4¼% Bonds | | 82,000.00 | Lot Fifteen, Parcel 5 | Acquired with general cash, June, 1914—deposited with State Industrial Commission | See Exhibit #53, Item #5, See Exhibit #56, Item #5 | See Arguments C and D |

| No. | Item | No. of Shares or Bonds | Face or Par Value | Location in Decree | History of Item | Evidence | Alleged Reasons Why Not Covered by the Lien |
|---|---|---|---|---|---|---|---|
| 8 | Liberty Loan Bonds U. S. 4¼% (Second Converted 4s) | | 2,550.00 | Lot Fifteen, first two items of Parcel 6 | Acquired with general cash, various times—$1,450 in Treasury; $1,100 with City Comptroller account of Kingsbridge Railway Co. Permit | See Exhibit #53, Item #6, See Exhibit #56, Item #6 | C See Arguments and D |
| 9 | Central Crosstown Railroad Company 351 Shares of Capital Stock | 351 | 35,100.00 | Lot Fifteen, Parcel 8 | Acquired from Joint Committee on Reorganization, January, 1913—now in Treasury | See Exhibit #53, Item #8, See Exhibit #56, Item #8, See Exhibit CC | B See Arguments and D |
| 10 | Central Park, North & East River Railroad Company Capital Stock | 3,000 | 300,000.00 | Lot Fifteen, Parcel 11 | These were owned by the New York Railways Company on January 1, 1912, but were not specifically described in the First Real Estate and Refunding Mortgage dated January 1, 1912. They are now in the possession of the Guaranty Trust Company | See testimony of Mr. Samuelson on page 92 | The mortgage on page 58 specifically excepts "Choses in action and shares of stock and bonds owned by the company at the date hereof not in this indenture elsewhere enumerated or specifically described." See Tort Creditors' Brief, p. 12. The brief of the First and Refunding Mortgage Trustee admits that this stock is not covered (p. 26). |
| 11 | People Traction Company Capital Stock | 15,000 | 1,500,000.00 | Lot Fifteen, Parcel 12 | Acquired by general cash, December, 1913—now in Treasury | See Exhibit #53, Item #11, See Exhibit #56, Item #11 | C See Arguments and D |
| 12 | Fulton Street Railroad Company Capital Stock | 5,000 | 500,000.00 | Lot Fifteen, Parcel 13 | Acquired by general cash, December, 1913—now in Treasury | See Exhibit #53, Item #12, See Exhibit #56, Item #12 | C See Arguments and D |

| No. | Item | No. of Shares or Bonds | Face or Par Value | Location in Decree | History of Item | Evidence | Alleged Reasons Why Not Covered by the Lien |
|---|---|---|---|---|---|---|---|
| 13 | 28th and 29th Streets Crosstown Railroad Company Capital Stock | 15,000 | 1,500,000.00 | Lot Fifteen, Parcel 14 | Acquired by general cash, December, 1913—now in Treasury | See Exhibit #53, Item #13 See Exhibit #56, Item #13 | See Arguments C and D |
| 14 | Edenwald Street Railway Company Capital Stock | 250 | 25,000.00 | Lot Fifteen, Parcel 15 | Acquired by general cash, December, 1913—now in Treasury | See Exhibit #53, Item #14 See Exhibit #56, Item #14 | See Arguments C and D |
| 15 | Metropolitan Street Railway Company Capital Stock (Scrip) | | 52.73 | Lot Fifteen, Parcel 16 | Acquired by general cash, December, 1913—now in Treasury | See Exhibit #53, Item #15 See Exhibit #56, Item #15 | See Arguments C and D |
| 16 | Interborough-Metropolitan Company Fractional Scrip Voting Trust Certificates Common Stock | | 20.00 | Lot Fifteen, Parcel 17 | Acquired by general cash, December, 1913—now in Treasury | See Exhibit #53, Item #16 See Exhibit #56, Item #16 | See Arguments C and D |
| 17 | Wall & Cortland Street Ferries Railway Company First Mortgage Bonds—Temporary Receipt of Central Trust Company dated Aug. 26, 1898 | | 1,000,000.00 | Lot Fifteen, Parcel 18 | Acquired by general cash, December, 1913—now in Treasury | See Exhibit #53, Item #17 See Exhibit #56, Item #17 | See Arguments C and D |
| 18 | Metropolitan Crosstown Railway Company First Mortgage 5% Bonds | | 600,000.00 | Lot Fifteen, Parcel 19 | Acquired by general cash, March, 1912, and May 1913—now in Treasury | See Exhibit #53, Item #19 See Exhibit #56, Item #19 | See Arguments C and D |
| 19 | 145th Street Crosstown Railroad Company Capital Stock | 20 | 2,000.00 | Lot Fifteen, Parcel 20 | Acquired by general cash, February, 1912—now in Treasury | See Exhibit #53, Item #20 See Exhibit #56, Item #20 | See Arguments C and D |
| 20 | New York City Railway Company Capital Stock | 130,000 | 13,000,000.00 | Lot Fifteen, Parcel 21 | Turned over to New York Railways Company under settlements of March 22, 1916, by New York City and Metropolitan Receiverships | See Exhibit #53, Item #23 See Exhibit #56, Item #23 See Exhibit BB | See Arguments B, C and D |

| No. | Item | No. of Shares or Bonds | Face or Par Value | Location in Decree | History of Item | Evidence | Alleged Reasons Why Not Covered by the Lien |
|---|---|---|---|---|---|---|---|
| 21 | Wall & Cortland Street Ferries Railway Company Shares | 10,000 | 1,000,000.00 | Lot Fifteen, Parcel 22 | Turned over to New York Railways Company under settlements of March 22, 1916, by New York City and Metropolitan Receiverships | See Exhibit #53, Item #24; See Exhibit #56, Item #24; See Exhibit BB | See Arguments B, C and D |
| 22 | Metropolitan Street Railway Company Three Year Collateral 5% Imp. Notes dated March 23, 1907 | | 4,000,000.00 | Lot Fifteen, Parcel 23 | Turned over to New York Railways Company under settlements of March 22, 1916, by New York City and Metropolitan Receiverships | See Exhibit #53, Item #25; See Exhibit #56, Item #25; See Exhibit BB | See Arguments B, C and D |
| 23 | Brooklyn & North River Railroad Company 5% Demand Notes | | 65,329.80 | Lot Fifteen, Parcel 21 | Acquired by general cash at various times—now in Treasury | See Exhibit #53, Item #26; See Exhibit #56, Item #26 | See Arguments C and D |
| 24 | Metropolitan Street Railway Co.— (a) Capital Stock (b) 5% Gen. Mort. bonds (c) 4% Refund. M. bonds | 495,029 | 49,502,900.00 12,242,000.00 16,488,000.00 | Lot Fifteen, Parcel 25 | Turned over from Joint Committee on Reorganization, Metropolitan Street Railway Company | See Exhibit #53, Item #27; See Exhibit #56, Item #27; See Exhibit CC | See Arguments B and D |
| 25 | New York Railways 1st R. E, & R. Mortgage Bonds | | 1,000,000.00 | Parcel 29 of Lot One and Lot Eleven | These bonds are with the Guaranty Trust Co. as collateral to a loan. They constitute an investment of cash from receivership settlement | See Exhibit #53, Item #18; See Exhibit #56, Item #18 | See Arguments A, B, C and D See especially Brief of Contract Creditors, p. 12. The First and Refunding Mortgage Trustee admits, in its brief (p. 26), that these bonds are not covered by the mortgage |
| 26 | Note dated April 1, 1907, New York City Railway Company | | 500,000.00 | Parcel 29 of Lot One and Lot Eleven, in general language cover there | The note is stamped "paid" $265,444.77. Part of settlements of March 22, 1916 | See Exhibit #53, Item #22; See Exhibit #56, Item #22; See Exhibit BB | See Arguments B, C and D |

## REAL ESTATE.

| No. | Item | No. of Shares or Bonds | Face or Par Value | Location in Decree | History of Item | Evidence | Alleged Reasons Why Not Covered by the Lien |
|---|---|---|---|---|---|---|---|
| 1 | Mt. Vernon Property | | | Lot Fourteen on page 51 | Turned over under New York City and Metropolitan Receivership Settlements, March 22, 1916. This property is not a part of the New York Railways plant in operation | See Exhibit #53, Item #38 See also Exhibits BB and AB-3 | See Arguments B and D |
| 2 | Lenox Ave. and 104th-141st Sts. | | | Lot Thirteen on page 49 | Turned over under New York City and Metropolitan Receivership Settlements, March 22, 1916 | See Exhibit #53, Item #39 See also Exhibit AB-3 See also Exhibit BB | See Argument B See Contract Creditors' Brief, p. 11. |

### MATERIALS AND SUPPLIES.

| No. | Item | No. of Shares or Bonds | Face or Par Value | Location in Decree | History of Item | Evidence | Alleged Reasons Why Not Covered by the Lien |
|---|---|---|---|---|---|---|---|
| 1 | Materials and Supplies in inventories DD, EE and FF | | | | These supplies and materials were in warehouses and storerooms ready to replace wornout machinery, etc. They were not yet part of the plant in operation | See Mr. O'Connor's testimony, page 107 thru 112 See Exhibits DD, EE and FF See also Exhibit #53 | See Arguments D and E |

### SPECIAL FUNDS AND CLAIMS.

| No. | Item | No. of Shares or Bonds | Face or Par Value | Location in Decree | History of Item | Evidence | Alleged Reasons Why Not Covered by the Lien |
|---|---|---|---|---|---|---|---|
| 1 | Eighth Avenue Railroad Co. —Fire Loss—Building | | 64,535.92 | Parcel 29 of Lot One and Lot Eleven. The general language of these lots may cover this property | This fund was assigned to the New York Railways Company under the Receivership Settlement of March 22, 1916. The ownership of the principal of the fund is now being litigated between the Receiver of New York Railways and the Eighth Avenue Railroad Company. This fund has been turned over to Receiver of New York Railways and deposited in his general cash under an agreement which reserved the rights of the Eighth Avenue Railroad Company to claim ownership thereto | See Exhibits #53 and #56 See Exhibit BB See Exhibit AB-3 | See Argument B The mortgage specifically excepted from its lien "Cash, or any claims to cash, or the proceeds of assets when reduced to cash, in the hands of the court, or the Receivers of the Metropolitan Company, or W. W. Ladd as Receiver of the New York City Railway Company." |

| No. | Item | No. of Shares or Bonds | Face or Par Value | Location in Decree | History of Item | Evidence | Alleged Reasons Why Not Covered by the Lien |
|---|---|---|---|---|---|---|---|
| 2 | In re Long Island Land Fertilizing Co.— Cash Claim against Trustees | | 6,064.33 6,269.89 | Parcel 29 of Lot One and Lot Eleven. The general language of these lots may cover this property | The cash was received from the trustees, being proceeds of certificates of stock under dissolution of the Long Island Land Fertilizing Company, standing in the name of the 42nd Street & Grand Street Ferry Railroad Company and the 23rd Street Railway Company. The claim is on the same account. The funds are carried as liabilities to leased lines pending legal determination thereof | See Exhibit #53 See Exhibit AB-3 | The interest of the New York Railways Company is that of trustee for the 42nd Street & Grand Street Ferry Railroad Co. and the 23rd Street Railway Co. |
| 3 | Central Crosstown Railroad Co.— Construction Fund Fire Loss—Cars (2nd Ave, and 96th St. Fire Loss) | | 1,733.75 1,067.79 | Parcel 29 of Lot One and Lot Eleven. The general language of these lots may cover this property | These funds were derived by the New York Railways Company under the Receivership Settlements | See Exhibit #52, Item #37 See Exhibit #56, Item #37 See Exhibit AB-3 | See reasons under Eighth Avenue Railroad Co. Fire Loss Fund |
| 4 | Claims against City of New York for Special Franchise Tax Refunds Receivable—Years 1912-1914 | | 377,171.69 | Parcel 29 of Lot One and Lot Eleven. The general language of these lots may cover this property | These refunds due by the City of New York to the New York Railways Company under orders of the New York Supreme Court entered December 9, 1917, represent excess special franchise taxes paid by the New York Railways Company covering owned and leased lines for the years 1912, 1913 and 1914 | See Exhibit AB-3 | See Argument D See Argument C See Argument A |