### In re THIRD AVE. TRANSIT CORP. et al.

United States District Court,
S. D. New York.
April 26, 1954.

Wagner, Quillinan, Tennant & Nussenfeld, New York City, for Colonial Trust Co. as Adjustment Mortgage Trustee.

Bergerman & Hourwich, New York City, for Adjustment Bondholders' Committee (Lee Thompson Smith, Chairman), Joseph Calderon, New York City, of counsel.

Baker, Obermeier & Rosner, and Kresel & Meyerson, New York City, for Tinker Committee for Adjustment Mortgage Bonds.

Alfred Koerner, New York City, for stockholders, as per statement filed under Sec. 210, Bank.Act.

DIMOCK, District Judge.

The Reorganization Trustee has moved for a determination of the status of $5,681,500 of First Refunding Mortgage bonds held by him. They are bonds of Third Avenue Railway Company to which company the debtor, Third Avenue Transit Corporation, is successor by merger. They will hereinafter be sometimes referred to as the Treasury Bonds. The debtor and its predecessor, Third Avenue Railway Company, will be referred to interchangeably as the debtor.

Saxe, Bacon, O'Shea & Bryan, New York City, for Lester T. Doyle, trustee in Reorganization, William J. O'Shea, Edward D. Burns, John A. Kiser, New York City, of counsel.

Kelley, Drye, Newhall & Maginnes, New York City, for Hanover Bank, trustee under the First Refunding Mortgage Bonds, Frank H. Heiss, W. Frederick Knecht, New York City, of counsel.

Murphy, Block, Sullivan & Sawyer, New York City, for O'Connell Committee for First Refunding Mortgage Bonds, Mendel Lurie, New York City, of counsel.

Harold P. Seligson, New York City, for Amott Committee for First Refunding Mortgage Bonds, Edmund Burke, Jr., New York City, of counsel.

Hays, St. John, Abramson & Schulman, New York City, for petitioning creditors, Edward M. Garlock, New York City, of counsel.

The Right of a Trustee in Reorganization to Enforce Mortgage Bonds of the Debtor Corporation Held by it.

The Reorganization Trustee and parties whose interests are junior to those of the holders of First Refunding Bonds contend that the Reorganization Trustee has a right to enforce these bonds against the mortgaged property for the benefit of the junior interests. The Indenture Trustee of the First Refunding Mortgage and the holders of the bonds secured by it contend that the Reorganization Trustee has no such right. They say that the Treasury Bonds, in the event of foreclosure of the First Refunding Mortgage, would not share in the proceeds of the security thereunder or in any deficiency judgment obtained.

The Reorganization Trustee, in support of his position, says that all of the Treasury Bonds were duly issued and were from time to time repurchased by

the debtor with the intention that they should be kept alive and therefore that, so far as their enforcement against the mortgaged property was concerned, they should be treated just like bonds in the hands of the public. The most fundamental contention of the First Refunding Mortgage interests in opposition is that, even granting that the Treasury Bonds were duly issued and were repurchased with the intention that they should be kept alive, they were, from the instant of repurchase and as long as held by the debtor or the Reorganization Trustee, unenforcible by either of them.

It may be well at this point to make clear my intention in entertaining this motion. It seems to me that it will be of value to all parties in the consideration of a plan of reorganization if they know the court's view as to the legal rights of the claimants. Those rights must necessarily be translated as best the court can into the distribution of the securities under any plan of reorganization.

■ Carrying out that intention, I will consider just what the contention of the Reorganization Trustee would mean in the event of liquidation. Liquidation would involve the foreclosure of the First Refunding Mortgage. The proceeds would be distributable to the bondholders. Under the contention of the Reorganization Trustee, a ratable share of these proceeds would be applicable to the Treasury Bonds and, since the Treasury Bonds are held by the Reorganization Trustee free of the lien of First Refunding Mortgage, the ratable share of the proceeds of the mortgaged property applicable to the Treasury Bonds would be assets distributable to the junior creditors as their interests might appear. Insofar as the holders of the publicly held First Refunding Mortgage bonds were not paid in full, they would be general creditors entitled to share in the proceeds of the mortgaged property applicable to the Treasury Bonds along with the rest of the free assets. If, on the other hand, the Treasury Bonds are not enforcible in liquidation, the proceeds of the security

which would otherwise be applicable to the Treasury Bonds will be applicable to the publicly held bonds to the same extent as the rest of the proceeds of the mortgaged property. The controversy thus is one which concerns only the creditors, despite elaborate briefs filed on behalf of the stockholders. The question to be determined is simply the order in which certain of the assets would be applied in case of liquidation among the various classes of creditors. No assets will be created for the stockholders by an answer to the question either way. If the assets are insufficient, so that nothing would be left over for the stockholders, a decision that the holders of the publicly held bonds are not entitled to a lien upon the property represented by the Treasury Bonds will not help the stockholders. If the assets are sufficient, so that there would be a surplus for the stockholders, a decision that the holders of the publicly held bonds are entitled to all of the mortgaged security will not harm the stockholders.

As a matter of common sense, the First Refunding Bondholders' position that the Treasury Bonds cannot be enforced against the mortgaged property seems unassailable. A man cannot owe himself money; hence there is no debt represented by the Treasury Bonds. There can be no security without a debt; hence the Treasury Bonds have no interest in the security under the mortgage.

In spite of the unassailable logic of the position of the First Refunding Bondholders, however, there are business practices which afford a specious argument against it and—even more important—court decisions that, to say the least, give the First Refunding Bondholders an uphill fight.

Corporations do buy their own bonds and treat them as investments. They sometimes even go through the solemn formality of entering on their books the payment of the interest ostensibly payable on the corporation-held bonds and the receipt of that very interest as investment income. That practice is not limited to cases where the bonds are

held by the corporation in some trust capacity, such as is required by some sinking fund agreements, but is followed in some cases where it would seem to be an idle gesture. Perhaps the usual motive for such treatment of repurchased bonds is to give them as many as possible of the indicia of life so as to support the claim that they have not been cancelled. That question becomes important in the event of a subsequent desire to resell the bonds. The usual trust indenture limits the amount of bonds which may be secured thereunder and does not permit the authentication and delivery of more than the amount of bonds so limited even though the excess is to be issued to replace bonds which have been repurchased and cancelled. Thus the question has often arisen whether the corporation had the right to reissue repurchased bonds or whether the mere possession of the bonds by the corporation prevented their subsequent issue. That question, in essence, is only whether, under the terms of the particular mortgage, the corporation may thus again give the security of the bonds to a new loan after it has, in effect, paid the old loan by repurchasing the bonds. To reach the decision that the corporation may thus reissue repurchased bonds it is not necessary to hold that the bonds, while in the corporation's possession, could have been enforced against the mortgaged property. There is thus not much light to be obtained from the decisions dealing with the impact of mortgage restrictions where bonds have been repurchased and are desired to be reissued. See Pruyne v. Adams Furniture & Mfg. Co., 92 Hun 214, 36 N.Y.S. 361, affirmed 155 N.Y. 629, 49 N.E. 1103. The holding that bonds may be so reissued can be reached without doing violence to the axiom that a man cannot owe himself money. It is only when the question of enforcing repurchased bonds before reissue arises that we run head on into that homely truth.

There are only three or four decisions which deal with the status of repurchased bonds before reissue but all but one of them favor the right of mortgagor-held bonds to share in the security in case of foreclosure. American Brake Shoe & F. Co. v. New York Rys. Co., D.C. S.D.N.Y., 277 F. 261; Westinghouse Electric & Mfg. Co. v. Brooklyn R. T. Co., D.C.S.D.N.Y., 288 F. 221; Crawford v. Washington Northern R. Co., 9 Cir., 233 F. 961, 964–965. The opinion in Claflin v. South Carolina R. Co., C.C.S.C., 8 F. 118, 126, contains the dictum with respect to repurchased bonds: "When in the hands of the company their lien under the mortgage was suspended; but the moment they were out in the usual course of business, it again took effect as of the time the mortgage was given." Cases are to be distinguished where the bonds have never been issued and bonds which were unissued up to the time when they were delivered under a pledge are treated as unissued when returned to the pledgor on payment of the pledge. Westinghouse Electric Mfg. Co. v. Brooklyn R. T. Co., D.C.S.D.N.Y., 288 F. 221, 236, 247, supra; New York Security & Trust Co. v. Equitable Mortg. Co., C.C.D.S.D. N.Y., 77 F. 64.

The New York Railways case, supra, is one where the mortgagor had repurchased one-eighteenth of an issue of bonds and then pledged them to secure a loan of $400,000. Judge Mayer directed that, upon foreclosure, the proceeds should be allotted seventeen-eighteenths to the publicly held bonds and one-eighteenth to the repurchased bonds. He directed that the loan of $400,000 be repaid out of this one-eighteenth of the proceeds and that the "balance, if any, will go to the Railways Company, and will be applicable to the payment of general creditors' claims". [277 F. 282.] The case might be distinguished from that at bar on the technical ground that the bonds were outstanding rather than held by the mortgagor. Judge Mayer seems to have had something like that in mind when he said, 277 F. at page 282, "But a bond cannot be outstanding and yet not outstanding. It is either dead or alive. If alive, it is entitled to share in the proceeds of the foreclosure sale." If the court there

had, however, felt bound by the logic of the proposition that a corporation cannot be a creditor of itself, it could have treated the bonds as outstanding but only for the purposes of the pledge, and directed that the surplus go to the holders of the publicly-held bonds.

The Brooklyn Rapid Transit case, supra, where the question again came up in this district, offers, however, no possible ground for distinction. There, at 288 F. at pages 236 and 247, Judge Lacombe, as Special Master, found that: (a) $1,650,000 of the bonds had never been issued and were not entitled to share in the mortgaged assets; (b) $3,422,000 of the bonds, which had been used as collateral for loans and returned to the treasury upon payment of the loans, had the same status as unissued bonds; and (c) $20,000 of the bonds, which had been bought in the market by a subsidiary (subsequently merged) of the B.R.T., were entitled to share in the mortgaged assets.

On the motion to confirm the Special Master's report, it was contended that the ruling as to the $20,000 of bonds was unsound but Judge Mayer rejected the claim, saying; 288 F. at page 247:

"Bonds in Hands of B.R.T.—$5,092,000—When Receiver was Appointed.

"None of these are 'free assets,' except the group making up the $20,000 referred to in the special master's report.

"It is contended that the conclusion of the special master as to the $20,000 of bonds and the decision of this court in respect of a similar question in American Brake Shoe & Foundry Co. v. New York Railways [D.C.], 277 F. 261, 281, are unsound. The contention is interesting, but, for the present, the court, on the facts here existent, will agree with its previous view."

The reference was to his own earlier decision in the New York Railways case discussed immediately above.

Besides these authorities, the Court of Appeals for the Ninth Circuit, in Crawford v. Washington Northern R. Co., 233 F. 961, supra, seems to have expressed the view that bonds held by a mortgagor have an interest, though a junior one, in the security held under the mortgage.

In spite of my personal disagreement with these authorities I am unwilling, in the absence of any authority against them, to depart from their precedent, and so I must hold that the Treasury Bonds in the case at bar are not eliminated from participation in the security simply because of their ownership by the debtor when these proceedings became effective.

I must therefore consider whether there is any other impediment to their enforcement for the benefit of the junior claimants.

The Effect of Section 55 of the New York Public Service Law.

It is urged on behalf of the publicly held bonds that the enforcement of the Treasury Bonds for the benefit of the junior claimants would contravene section 55 of the New York Public Service Law, Consol.Laws, c. 48. That section contains the following provisions:

"The issue of stocks, bonds or other evidences of indebtedness, within the meaning of this section, shall include the sale by any such corporation of any such securities previously issued in compliance with the provisions of this section and subsequently reacquired by such corporation, provided, however, for good cause shown the commission may exempt from the restriction hereof stocks, bonds or other evidences of indebtedness. * * * Such corporation shall not without the consent of the commission apply said issue or any proceeds thereof to any purpose not specified in such order."

It is said that any recognition in this proceeding of the Treasury Bonds as claims against the mortgaged assets would, in effect, constitute a sale of previously issued and reacquired bonds without Public Service Commission ap-

proval. The enforcement of bonds for the benefit of junior security holders is very different from a sale. No Public Service Commission approval is required under section 55 of the New York Public Service Law although it happens that Public Service approval of any reorganization which would reflect such enforcement is required by section 178 of the Bankruptcy Act, 11 U.S.C. § 578.

The $1,667,000 of "Sinking Fund" Bonds.

The debtor used a so-called Sinking Fund Account for payment to holders of its First Refunding Bonds for surrender thereof. I shall hereinafter refer to all such transactions as purchases without intending thereby to prejudge the question whether the transaction really constituted a retirement. The bonds so purchased were of a face amount of $1,-667,000. The Sinking Fund Account was established to record the amounts set aside pursuant to three orders of the New York Public Service Commission. The first order directed that the expenses of sale and bond discount involved in the issuance of $187,000 of bonds be amortized out of "an amortization fund" which was to be used "for the retirement of mortgage bonds or for the acquisition of property for capital or investment purposes." If this were the only direction with respect to the Sinking Fund, there would be no way of telling whether the debtor, when it purchased mortgage bonds, was intending to retire them or to invest in them unless the debtor expressed its intention. The second order authorized the issuance of $4,000,000 of bonds and directed the creation of a similar fund to be used "for the purpose of the retirement of mortgage bonds of said company or for other purposes approved by the Commission". The third order authorized the issuance of $2,020,500 of bonds and directed the creation of a similar fund for a purpose expressed in the same language. None of the payments for purchase of First Refunding Bonds were approved by the Commission so that, insofar as funds accumulated by the debtor under the second and third orders were concerned, any purchase of

First Refunding Bonds would have been a breach of the order of the Public Service Commission unless the bonds were retired. Besides providing for an amortization fund for the debtor, the third order provided for similar funds by two of the debtor's subsidiaries, the Union Railway and the Southern Boulevard Railroad, to be used "for the acquisition of property for capital or investment purposes or the discharge of obligations of the said company, the payment of which is approved by the Commission." Union purchased $356,000 First Refunding Bonds and Southern Boulevard $17,-500 First Refunding Bonds out of sinking funds set up under that order. By the agreement of merger and consolidation the debtor succeeded to the ownership of these bonds. They were carried in the same "Sinking Fund Account" as the bonds for the purchase of which Third Avenue had paid. With respect to the bonds for whose purchase the subsidiaries had paid, they were certainly alive at the time of the merger as investments of the subsidiaries and I can think of no reason why, as a result of the merger, it could be said that they became retired. After the merger it was just as important as before that the Commission's direction that they be carried as investments should be followed.

To recapitulate:

With respect to bonds purchased with funds accumulated under the first order there is no way of telling whether they were retired or not unless the intention of the debtor can be determined.

■ With respect to bonds purchased with funds accumulated under the second and third orders all must be deemed to have been retired because any other course would have been an infraction of the orders of the Public Service Commission.

■ With respect to bonds purchased by the Union Railway and the Southern Boulevard Railroad with funds accumulated under the third order, none can be deemed to be retired.

■ The question at present undetermined is whether the debtor intended to retire the bonds purchased with funds accumulated under the first order. Cases which I consider controlling have constrained me to hold that the fact that bonds held by a debtor are its own obligations does not prevent their enforcement against the mortgaged security. The problem thus is whether the debtor held the bonds or cancelled them. There can be but one answer to that. All of the $1,667,000 face amount of bonds were reported as assets to the Public Service Commission. The debtor went through the form of paying interest on them. They were all held in one custodian account. I hold that the bonds purchased with funds accumulated under the first Public Service Commission order are enforcible for the benefit of the junior creditors.

### The $2,520,500 of "Depreciation Fund" Bonds.

■ The debtor, at the time the Reorganization Trustee took possession, carried $2,520,000 First Refunding Mortgage Bonds in an account labeled "Fund for Depreciation and Contingencies". It had previously been called "For Depreciation, Renewals and Contingencies". The Trustee of the First Refunding Mortgage and the holders of the bonds secured thereby argue that these bonds were acquired by the debtor by the use of funds which, under orders of the Public Service Commission, could not be used to purchase First Refunding Bonds which would be enforcible for the benefit of junior interests. It is said that these orders required the debtor, before paying interest on its Adjustment Mortgage Bonds or paying dividends on its capital stock, to expend or set aside for maintenance, depreciation and renewals a sum equal to 20% of its gross operating revenue for each year and, if such amount should not be expended for those purposes during any one year, to credit the unexpended portion to a separate depreciation fund to be used from time to time for mainte-

nance, repairs, replacements and renewals. Although the debtor did set aside such a percentage of its revenues it challenged, under the authority of People ex rel. Third Avenue Ry. Co. v. Public Service Comm., 203 N.Y. 299, 96 N.E. 1011, the Commission's authority to make any such direction. This challenge proved valid when People ex rel. New York Cent. R. Co. v. Public Serv. Comm., 223 N.Y. 373, 119 N.E. 848, was decided. We are not therefore presented with a situation such as that involving the second and third orders of the Public Service Commission establishing the funds which were used to purchase some of the $1,667,000 "Sinking Fund" Bonds. There the orders fixed the bonds as retired willy nilly, and retired they were, irrespective of the intention of the debtor. Here, since the debtor was not constrained by the order of the Public Service Commission, the debtor's intention has full sway. The debtor's intention to keep the bonds alive was just as clear as in the case of the "Sinking Fund" bonds. They were carried as "current assets". Interest was paid on them. Two blocks of them were taken from the custodian account and used as security.

■ As to $2,020,500 of them, however, the further point is made that they were never actually issued. What happened was that the debtor sold to the Trustee of the First Refunding Mortgage, in its banking capacity, a certificate entitling the Trust Company to $2,020,500 face amount of First Refunding Mortgage Bonds "when ready for delivery". The Trust Company paid for the bonds and then endorsed the certificate to the debtor in consideration of payment made by the debtor from the "Fund for Depreciation and Contingencies". Definitive bonds were later delivered by the Trust Company, as Trustee under the mortgage, to itself, as custodian for the debtor.

One cannot help surmising that the purchase by the Trust Company was made for the very purpose of effecting an issuance of the bonds but it is said that the purpose failed of accomplish-

ment because of the delivery of the certificate in lieu of a delivery of the bonds themselves. I can see no substantial difference for the purposes of the present problem and reject the contention that the $2,020,500 "Depreciation Fund" Bonds were never issued.

The $1,494,000 of "Amortization" Bonds.

The debtor purchased $1,494,000 of its First Refunding Mortgage Bonds out of a fund resulting from a new depreciation policy adopted by it in July, 1942, for the purpose of providing a reserve for the retirement of some $55,000,000 of street railway assets which would be scrapped as a result of motorization. These bonds were carried on the debtor's books as "Securities Purchased out of Moneys Deducted from Revenue for Depreciation and Credited to Accrued Amortization of Capital." There can be no doubt that these bonds were originally outstanding and no doubt of the debtor's intention to keep them alive. The resolutions authorizing their purchase provide that "interest on such bonds shall be collected and shall constitute part of * * * general cash funds." In January, 1949, the debtor applied to the Public Service Commission for, and obtained, authority to pledge $865,000 of these bonds as security for franchise compensation owed to the City of New York. In March, 1949, the debtor applied to the Public Service Commission for, and obtained, authority to pledge $194,000 of these bonds with a bonding company as security for an appeal bond. The latter authority was granted over the opposition of representatives of the First and Refunding Mortgage Bondholders. At the time the Reorganization Trustee took possession of the estate these two blocks of bonds were still outstanding as security and the rest of the $1,494,000 were held in a custodian account.

▪ It is said on behalf of the First Refunding Mortgage Bondholders, however, that these bonds were held in some special capacity which would prevent their enforcement against the security for the benefit of junior creditors. Attention is called to an opinion of counsel for the debtor that the bonds could only (1) be retired or (2) be used to raise funds for renewals or replacements of capital assets which would come directly under the lien of the First Refunding Mortgage. This opinion of counsel did not subject the bonds to any trust and the fact that the better part of the bonds were pledged as security in hostility to counsel's opinion is clear evidence that the debtor did not regard the bonds as subject to any trust.

The bonds which had been used as security were redeemed by the Reorganization Trustee. It is urged on the part of the First Refunding Mortgage Bondholders that the funds used for that redemption were funds pledged under their mortgage. I have not sufficient facts before me to permit me to determine that question.

 Subject to the possible tracing of funds of the First Refunding Mortgage Bondholders into bonds of this $1,494,000 "Amortization" group, I hold that they were duly issued and outstanding and are enforcible for the benefit of the junior creditors.

The Effect of the After-Acquired Clause.

 A contention is made on behalf of the Adjustment Mortgage Bondholders that the Treasury Bonds are pledged under their mortgage by virtue of the operation of the after-acquired clause. It is said that the after-acquired property clause in the First Refunding Mortgage is ineffective to subject the Treasury Bonds to its lien because bonds issued under a mortgage cannot be subject to its lien. While I am not convinced of the soundness of that proposition I need not examine it since, for a different reason, the Treasury Bonds constitute free assets in the hands of the Reorganization Trustee. He is armed with all the rights of a levying creditor. After-acquired property clauses are held to be invalid as against the rights of a levying

creditor, Nash v. Onondaga Hotel Corporation, 2 Cir., 140 F.2d 209. An exception is made in the case of public utility corporations, American Brake Shoe & F. Co. v. New York Rys. Co., D.C. S.D.N.Y., 277 F. 261, 279–281, supra; Platt v. New York & Sea Beach R. Co., 9 App.Div. 87, 41 N.Y.S. 42, affirmed 153 N.Y. 670, 48 N.E. 1106, but the exception is limited to "property necessary and appropriate for the physical operation of its franchises", Pintsch Compressing Co. v. Buffalo Gas Co., 2 Cir., 280 F. 830, 836.

### Subordination to the Claim of Publicly Held Bonds.

Finally the First Refunding Mortgage Bondholders contend that, even if the Treasury Bonds must share in the security under the mortgage, their claim should be subordinated to that of the publicly held bonds. Under that contention the Treasury Bonds would share in the proceeds of the security but would not share in it until the publicly held bonds had been satisfied. The arguments advanced to produce this result are the ones which were advanced to produce the result of complete obliteration of the Treasury Bonds. There is nothing about the arguments which makes them more valid to produce the result of subordination than they were to produce the result of obliteration.

I do not understand the plea for priority to be one which asks for consideration for the publicly-held bonds on reorganization different from that to which they would be entitled in this court on liquidation. If that is its purpose I disregard it in accordance with my intention stated at the outset to determine only the rights of parties on liquidation.

### Conclusion.

The effect of the foregoing opinion is that all of the Treasury Bonds are enforcible by the Reorganization Trustee for the benefit of junior creditors except that part of the $1,667,000 of "Sinking Fund Bonds" purchased with funds accumulated under the second and third

Public Service Commission orders and except such, if any, part of the $1,494,000 of "Amortization Bonds" into which funds subject to the First Refunding Mortgage may be traced.